**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Erika Rodriguez-Acurio,<br><br>                          Petitioner,<br><br>                -v-<br><br>Judith Almodovar, Kristi Noem, and Pamela Bondi,<br><br>                    Respondents. | 2:25-cv-6065<br>(NJC) |

**OPINION AND ORDER**

NUSRAT J. CHOUDHURY, United States District Judge:

On October 29, 2025, Erika Rodriguez-Acurio filed this petition for a writ of habeas corpus (the "Petition") pursuant to 28 U.S.C. § 2241, challenging the lawfulness of her detention by Immigration and Customs Enforcement ("ICE"), and seeking a preliminary injunction or writ of habeas corpus immediately releasing her, or at a minimum affording her a bond hearing. (Pet. For Writ of Habeas Corpus ("Pet."), ECF No. 1.) She argues that on October 29, 2025, just after the conclusion of her credible fear interview, ICE agents detained her in violation of Section 236(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1226(a) ("Section 1226(a)") and the Due Process Clause of the Fifth Amendment to the U.S. Constitution. (Pet. ¶¶ 26–35.)

Respondents are federal government officials: Judith Almodovar, Acting Director of the ICE New York Field Office; Kristi Noem, the Secretary of the Department of Homeland Security ("DHS"); and Attorney General Pamela Bondi. Respondents argue that Rodriguez-Acurio's detention is governed by a different INA provision, 8 U.S.C. § 1225(b) ("Section 1225(b)"), and that this statute requires her detention. Although their arguments are imprecise and shifting, Respondents principally invoke Section 1225(b)(1), which applies to noncitizens

who satisfy criteria for inclusion in procedures known as expedited removal proceedings. In the alternative, Respondents rely on Section 1225(b)(2), which governs the mandatory detention of certain noncitizens who are "seeking admission" to the United States.

Shortly after Rodriguez-Acurio arrived in the United States in 2021, ICE paroled her into the country for one year under 8 U.S.C. § 1182(d)(5)(A) ("Section 1182(d)(5)(A)"), which permits noncitizens to be paroled "into the United States" for urgent humanitarian or significant public benefit purposes. With that authorization, Rodriguez-Acurio lawfully moved to New York and appeared for the sole ICE check-in scheduled for her. After her parole expired, she resided continuously in the United States for more than three years, gave birth to her U.S. citizen son, applied for asylum, appeared for a USCIS fingerprinting appointment, applied for and was granted a five-year work authorization by USCIS starting in June 2025, worked as a housekeeper to support her family, and was scheduled and appeared for a credible fear interview with USCIS on October 29, 2025. She has never been charged or convicted of any crime in this country. However, after recounting harrowing experiences in Ecuador during her credible fear interview, Rodriguez-Acurio was unexpectedly ushered into another room and arrested and detained by ICE officers.

A textual analysis of Section 1225(b) compels the conclusion that *none* of the provisions of that statute authorizing the mandatory detention of noncitizens apply to Rodriguez-Acurio. Neither at the time of her arrest, nor at any point thereafter, was Rodriguez-Acurio subject to mandatory detention pending expedited removal as an "arriving alien" under Section 1225(b)(1)(A)(i) or as a noncitizen designated for such treatment under Section 1225(b)(1)(A)(iii). She also was not subject to mandatory detention under Section 1225(b)(2) as a noncitizen who, among other things, was "seeking admission" to the United States. Contrary to

2

Respondents' contentions, Rodriguez-Acurio's detention falls squarely within the discretionary detention framework of Section 1226(a), which permits detention when a DHS officer has made an individualized determination that a noncitizen poses a flight or safety risk. That framework also authorizes an appeal of a DHS denial of release on bond to an immigration judge.

Rodriguez-Acurio's parole into the United States under Section 1182(d)(5)(A) was premised by law on the determination that she did *not* pose a safety risk. Nothing in the record before this Court shows any change in circumstances. No one at DHS or ICE ever made any individualized determination that Rodriguez-Acurio poses a flight or public safety risk before she was suddenly arrested and detained on October 29, 2025, immediately following her credible fear interview. Rodriguez-Acurio's detention is a clear infringement of her significant liberty interest in being free from imprisonment—the quintessential interest triggering the procedural due process protections of the Fifth Amendment, the hallmark of which is the requirement to provide notice and an opportunity to be heard. In light of Rodriguez-Acurio's significant interest in physical liberty, even as a noncitizen subject to discretionary detention under Section 1226(a), the high risk of erroneous deprivation, and the government interests in guarding against flight risk and protecting public safety, Respondents' detention of Rodriguez-Acurio without providing any notice or opportunity to be heard before a DHS officer or an immigration judge is a violation of her right to procedural due process.

Accordingly, for the reasons explained below, Respondents detained Rodriguez-Acurio under Section 1226(a) and did so in violation of her Fifth Amendment rights. The Petition is therefore granted.[1]

## BACKGROUND

### I.    Factual Background

####    A.    Rodriguez-Acurio's Entry into the United States

Erika Rodriguez-Acurio is 30 years old and the mother of a three-year old U.S. citizen son. (Pet., Ex. B; Jonathan Lipsitz Aff. ¶ 6, ECF No. 1-6.) A citizen of Ecuador, she journeyed to the United States in September 2021 to seek asylum based on alleged physical and gender-based violence by local law enforcement in her native country, which led her to fear for her safety. (Pet ¶ 1, 11; *id.*, Ex. B; Lipsitz Aff. ¶ 11; Mem. L. Resp. Show Cause Order ("Resp.") at 7, ECF No. 14.)

Rodriguez-Acurio reported during a credible fear interview that in Ecuador, she experienced "severe domestic abuse by her ex-husband, including being beaten until she lost consciousness and suffered a broken nose and eye injury requiring hospitalization." (Lipsitz Aff. ¶ 11 (attesting to what Rodriguez-Acurio recounted in the interview).) Rodriguez-Acurio also reported experiencing gender-based violence by local law enforcement. After Rodriguez-Acurio obtained a restraining order against her ex-husband, who is the son of a high-ranking security official in Ecuador, members of the local police department "continued to harass her." (*Id.* ¶¶ 11–12.) At some point while she was living in Ecuador, Rodriguez-Acurio's ex-husband came to

---

[1] Rodriguez-Acurio brings a separate cause of action for violation of Section 1226(a). (Pet. ¶¶ 32–35.) In resolving Rodriguez-Acurio's due process claim, I consider whether her detention is governed by Section 1226(a) as a threshold issue. However, I do not decide whether her detention violates Section 1226(a) because it is clear that her detention violates her procedural due process rights under the Fifth Amendment.

her restaurant and sexually assaulted her, and she represents that the police "continue to look for her in Ecuador." (*Id.* ¶ 13.)

Around 4:00 a.m. on September 4, 2021, Rodriguez-Acurio entered the United States by walking across a "shallow part of the Rio Grande River." (Record of Sworn Statement in Proceedings Under Section 235(b)(1), Form I-867 ("Form I-867") at 2, ECF No. 21-2 at 2–5.) On or around that same day, an unnamed person with United States Customs and Border Protection ("CBP") encountered Rodriguez-Acurio near a port of entry in Eagle Pass, Texas. (First Langlois Decl. ¶ 3, ECF No. 14-1.) According to U.S. Immigration and Customs Enforcement ("ICE") Supervisory Detention and Deportation Officer Jason V. Langlois, based on his review of Department of Homeland Security ("DHS") records, during the encounter, Rodriguez-Acurio admitted to CBP that she had entered the United States by crossing the Rio Grande River near Eagle Pass, Texas. (*Id.*) Langlois attests that, because Rodriguez-Acurio "did not enter the United States through a designated port of entry," she was not inspected by an immigration officer when she entered or during this encounter with CBP. (*Id.* ¶ 3; Fourth Langlois Decl. ¶ 5, ECF No. 21-1; ECF No. 21 at 2.)

CBP detained Rodriguez-Acurio and transported her to the Carrizo Springs Border Patrol Station in Texas. (First Langlois Decl. ¶ 3.) According to the information set forth on a Form I-867A, a Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, on September 6, 2021, Rodriguez-Acurio told Border Patrol Agent Vincent Patlan III that she had a "fear of torture or persecution" if she returned to her home country. (Form I-867 at 3.) She also reported that it was her first time entering the United States, that she had not been arrested by police in the United States or any other country, and that she was traveling to New York and intended to stay in the United States "[i]ndefinitely." (*Id.* at 2–3.)

Langlois also attests that, on or about September 6, 2021, CBP inspected Rodriguez-Acurio and issued her a Notice and Order of Expedited Removal, Form I-860 ("Form I-860"), pursuant to 8 U.S.C. § 1225(b)(1)(A)(i), what is defined below as the "Arriving Aliens Provision" of 8 U.S.C. § 1225 ("Section 1225"). (First Langlois Decl. ¶ 4; Fourth Langlois Decl. ¶ 9; Form I-860, ECF No. 18-1.)[2] The Form I-860 is signed by Patlan and reflects that "[p]ursuant to . . . 8 U.S.C. 1225(b)(1)," DHS "determined that [Rodriguez-Acurio] [was] inadmissible to the United States" under 8 U.S.C. § 1182(a)(7)(A)(i)(I), on the basis that she was "an immigrant not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document" as required. (Form I-860.) However, the bottom half of the form presents fillable blanks for an "ORDER OF REMOVAL," but is not filled out. (*Id.*) The back of the Notice features an "X" and an illegible marking that appears to be a signature. (*Id.*) Because the "Order" portion of the form is blank there is no dispute Rodriguez-Acurio was not ordered removed, and this document is accurately described as a "Notice of Expedited Removal."

Also on September 6, 2021, Rodriguez-Acurio was issued a Notice to Alien Ordered Removed/Departure Verification, DHS Form I-296 ("Form I-296"), which is also signed by Patlan. (Form I-296, ECF No. 21-2 at 7.) The Form I-296 includes fillable blanks for "Verification of Removal," which are blank. (Form I-296.) It warns Rodriguez-Acurio that she was "found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the

---

[2] In his fourth declaration, Langlois refers to several provisions of "8 C.F.R. § 1225." (*See, e.g.*, Fourth Langlois Decl. ¶¶ 7, 9.) There is no section 1225 in title 8 of the Code of Federal Regulations, so it appears that Langlois intended to refer to 8 U.S.C. § 1225.

[INA]" and is prohibited from entering, attempting to enter, or being in the United States "for a period of 5 years from the date of [her] departure" from the United States. (ECF No. 21-2 at 7.)

Furthermore, Langlois attests that on September 6, 2021, Rodriguez-Acurio "was referred for an interview by an asylum officer pursuant to 8 [U.S.C.] § 1225(b)(1)(A)(ii)." (Fourth Langlois Decl. ¶ 7.) CBP served Rodrguez-Acurio with a Spanish language version of Form M-444, which informed Rodriguez-Acurio of her rights in connection with the credible fear interview. (First Langlois Decl. ¶ 5; ECF No. 14-2.) Rodriguez-Acurio was then transferred to ICE custody and detained pursuant to 8 U.S.C. § 1225(b)(1)(A)(iv) at the T. Don Hutton Detention Center in Taylor, Texas on or about September 8, 2021. (*Id.* ¶ 6; Fourth Langlois Decl. ¶ 9.) Roriguez-Acurio was not provided a credible fear interview while detained in Texas.

### B. Rodriguez-Acurio's Temporary Parole, Asylum Application, and Work Authorization

On September 14, 2021, ten days after she was first detained by CBP, Rodriguez-Acurio received a letter from DHS stating that ICE had "decided to parole [her] from its custody pursuant to its authority under [Section 1182](d)(5)(A)." (Interim Notice Authorizing Parole ("Parole Notice") at 1, ECF No. 1-2.) The Interim Notice reflects that Rodriguez-Acurio would reside in Glendale, New York and states that the parole authorization was "valid for only one year beginning from the date on [the] notice" and would terminate automatically "at the end of the one-year period unless ICE provides you with an extension at its discretion." (*Id.*) According to Langlois, the determination to release Rodriguez-Acurio on temporary parole was made based on "risk factors then existing that may have placed [her] at heightened risk, if she were to contract the COVID-19 virus." (First Langlois Decl. ¶ 7.)

As a result, on October 17, 2021, Rodriguez-Acurio was "temporarily paroled from ICE custody" under 8 U.S.C. § 1182(d)(5)(A), in accordance with the Interim Notice. (*Id.* ¶ 8.) On

October 21, 2021, she reported, as directed, to an ICE Field Office at 26 Federal Plaza, New York, New York. (*Id.* ¶ 9; Fourth Langlois Decl. ¶ 11; Parole Notice at 2.) "DHS records do not indicate what documents, if any, were given to [Rodriguez-Acurio] on that date, or whether any information was otherwise conveyed to [Rodriguez-Acurio] on that date." (Fourth Langlois Decl. ¶ 11.)

Langlois attests that during the fall of 2021, Enforcement and Removal Operations New York was processing hundreds of noncitizens and was "only instructed to reprocess Family Units, not single adults." (*Id.* ¶ 12.) According to Langlois, because Rodriguez-Acurio was not part of a family unit, "ICE did not reschedule [Rodriguez-Acurio] for another check-in, instead deferring to the Asylum Office review process to be completed." (*Id.* ¶ 13.)

As contemplated by the terms of her temporary parole, Rodriguez-Acurio resided first in Glendale, New York, and afterwards in Brooklyn with her husband. (Pet. ¶ 16.) She worked as a housekeeper for the next four years. (*Id.* ¶¶ 2, 16.) On August 2, 2022, Rodriguez-Acurio gave birth to her son (Pet. ¶ 16.), for whom she currently serves as primary caretaker (Lipsitz Aff. ¶ 6.). On September 14, 2022, Rodriguez-Acurio's temporary parole authorization terminated automatically pursuant to the terms of the Interim Notice. (First Langlois Decl. ¶ 10.)

With the assistance of legal counsel, on September 26, 2024, Rodriguez-Acurio filed a Form I-589, Application for Asylum and for Withholding of Removal ("Asylum Application"). (ECF No. 1-4.) That same day, Rodriguez-Acurio received a Form I-797C, Receipt Notice, which warned that although she could remain in the United States until her asylum application was decided, the application did not preclude ICE or CBP from placing her in removal proceedings. (*Id.*) It also notified Rodriguez-Acurio that 150 days after she filed her asylum application, she could file an application for employment authorization. (*Id.*) On October 7,

2024, Rodriguez-Acurio received an Appointment Notice for the submission of biometrics for her asylum application. (ECF No. 20-1.)

On October 30, 2024, Rodriguez-Acurio attended a U.S. Citizenship and Immigration Services ("USCIS") fingerprinting appointment. (ECF Nos. 20 at 2, 20-1; *see also* Nov. 10, 2025 Tel. Conf. Tr. 12:11–15:9 (reflecting that it is undisputed that Rodriguez-Acurio attended the fingerprinting appointment).) Rodriguez-Acurio did not have any other appointments with ICE or USCIS between October 21, 2021 and October 29, 2025—the day of her credible fear interview. (ECF No. 20 at 1; Fourth Langlois Decl. ¶¶ 11–14.) In the Petition, Rodriguez-Acurio states that "[i]n keeping 'with the terms and conditions of [her] release,' [Rodriguez-Acurio] 'reported . . . for every appointment directed.'" (Pet. ¶ 18.) Respondents have not submitted any evidence to contest this assertion.

Rodriguez-Acurio submitted an application for work authorization, which USCIS received on June 3, 2025 and granted just three days later on June 6, 2025. (Nov. 10, 2025 Tel. Conf. Tr. 12:25–13:2.) The record includes a copy of Rodriguez-Acurio's employment authorization card, which shows that USCIS granted her authorization to work in the United States for five years—from June 5, 2025 through June 4, 2030. (ECF No. 20-2.) The parties agree that the work authorization was granted in connection with Rodriguez-Acurio's I-589 asylum application. (Nov. 10, 2025 Tel. Conf. Tr. 4:12–5:25.) The work authorization card displays Rodriguez-Acurio's "alien number," which matches the "alien number" listed on both her Notice of Expedited Removal and her Interim Notice Authorizing Parole. (ECF Nos. 1-2, 18-1, 20-2.) There is no evidence in the record that USCIS rescinded Rodriguez-Acurio's work authorization at any time. (Nov. 10, 2025 Tel. Conf. Tr. 11:9–13 (Respondents' counsel stating

that "[w]e have no documentation in the record at this time . . . that [the work authorization] was rescinded").)

Seven days after granting Rodriguez-Acurio work authorization, USCIS notified Rodriguez-Acurio of the dismissal of her I-589 application by letter dated June 13, 2025. (ECF No. 1-5.) The dismissal notice states that "[t]he asylum office [could not] process [her] Form I-589 at this time," but that her "claim of fear [would] be considered by an asylum officer through the credible fear screening process." (*Id*.)

On October 22, 2025, USCIS issued Rodriguez-Acurio a Notice of Credible Fear Interview, Form G-56, directing that she appear at the New York Asylum Office in Bethpage, New York, on October 29, 2025 for a credible fear interview. (Fourth Langlois Decl. ¶ 14.) The notice indicates that the interview was scheduled for 7:00 AM. (ECF No. 21-2 at 9–10.)

C.  Rodriguez-Acurio's Credible Fear Interview, Arrest and Detention

On October 29, 2025, Rodriguez-Acurio reported as directed for her credible fear interview. (Lipsitz Aff. ¶ 1.) During that interview, she recounted the gender-based violence she experienced in Ecuador, including being severely beaten by her ex-husband until she lost consciousness, and police harassment. (*Id.* ¶¶ 10–13.) At the end of the interview, the USCIS officer asked her to enter a side room, where two ICE officers apprehended her. (*Id.* ¶¶ 4, 14.) At that time, Lipsitz explained to the officers that Rodriguez-Acurio was the primary caretaker for her three-year old child, who "would be left without her care" with the child's father. (*Id.* ¶ 6.) Nonetheless, ICE officers indicated their intent to detain Rodriguez-Acurio, and when Lipsitz "inquired about the reason for her detention, one of the officers acknowledged that it was unusual given her clean record and commented, 'This is just a sign of the times.'" (*Id.* ¶ 5.) Lipsitz "pleaded for an alternative to detention, such as an ankle monitor," and one of the ICE

officers attempted to contact a supervisor to request release with a GPS monitor, but the request was denied. (*Id.* ¶ 7.)

Rodriguez-Acurio was informed that she would be taken "first to Islip, then to Federal Plaza, and likely to Delaney." (*Id.* ¶ 9.) She was escorted out of the office in tears and transported to 100 Federal Plaza, Central Islip, New York, for processing. (*Id.* ¶ 9; First Langlois Decl. ¶ 12.) There, Rodriguez-Acurio was served with a Warrant for Arrest of Alien, Form I-200, signed by Langlois. (First Langlois Decl. ¶ 13; Form I-200 Warrant, ECF No. 14-3.) According to the warrant, there is probable cause to believe that Rodriguez-Acurio "is removable from the United States" based on "the execution of a charging document to initiate removal proceedings against" her. (Form I-200 Warrant.) On its face, the warrant indicates that Rodriguez-Acurio was arrested pursuant to "sections 236 and 287 of the Immigration and Nationality Act and part 287 title 8, Code of Federal Regulations," which correspond to 8 U.S.C. §§ 1226 and 1357 and 8 C.F.R. §§ 287.1–287.12. (*Id.*) Directly contradicting the face of the warrant attached to his declaration, Langlois attests, without submitting any supporting evidence in the record, that "ICE took [Rodriguez-Acurio] into custody pursuant to 8 C.F.R. [§] 235.3(b)(2)(iii) and 8 U.S.C. § 1225(b)(1) . . . ." (First Langlois Decl. ¶ 12.)

On October 30, 2025, Rodriguez-Acurio was transported from Central Islip, New York to ICE's processing space at 26 Federal Plaza, New York, New York, "pending accommodations at another facility." (William Joyce Decl. ¶ 7, ECF No. 15; First Langlois Decl. ¶ 14.) ICE's New Orleans Field Office approved bedspace for Rodriguez-Acurio in Louisiana. (Joyce Decl. ¶ 9.)

D.  Rodriguez-Acurio's Filing of the Habeas Petition and Subsequent Events

Rodriguez-Acurio filed the habeas petition initiating this action on October 29, 2025. Shortly after this action was assigned to this Court's docket on October 30, 2025, this Court

11

issued an order prohibiting Respondents from removing Rodriguez-Acurio from the United States or from transferring her to detention outside of the Eastern District of New York, the Southern District of New York, or the District of New Jersey in order to preserve this Court's jurisdiction. (Joyce Decl. ¶ 10; ECF No. 9.) The October 30, 2025 Order also set a briefing schedule on the Petition and notified the parties that the Court would hold a hearing on November 7, 2025. (ECF No. 9.)

Respondents elected to detain Rodriguez-Acurio at 26 Federal Plaza. According to William Joyce, Deputy Field Office Director in the New York City ICE Field Office of Enforcement and Removal Operations, the New Jersey ICE detention facility used to detain women did not have bed space, and ICE does not detain women in the Eastern District of New York and does not use any facilities other than 26 Federal Plaza to detain women in the Southern District of New York. (Joyce Decl. ¶¶ 1, 8–13.)

Rodriguez-Acurio was detained in "one of four rooms in the 26 Federal Plaza Hold Room facility." (Joyce Decl. ¶ 15.a.) Because 26 Federal Plaza is "not a designated detention space" it does "not have shower facilities or beds," so Rodriguez-Acurio slept on a sleeping mat. (Resp. at 9 n.3; Joyce Decl. ¶ 15.b.) Conditions of confinement for people in ICE detention at 26 Federal Plaza are governed by a preliminary injunction in *Barco Mercado v. Noem*, No. 25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97, which requires, among other things, "fifty square feet per" noncitizen, "exclusive of eight-foot buffer zone[s] around toilets" (Joyce Decl. ¶ 15.a). Joyce attests that Rodriguez-Acurio was detained in 26 Federal Plaza in accordance with those requirements. (Joyce Decl. ¶ 15.)

On November 4, 2025, Rodriguez-Acurio was transferred to the Elizabeth Contract Detention Facility in New Jersey. (ECF No. 16.) Two days later, on November 6, 2025, USCIS

issued a negative credible fear determination. (Third Langlois Decl. ¶ 3, ECF No. 19; ECF No. 19-1.) According to Langlois, Rodriguez-Acurio was served with the negative credible fear determination that same day and requested review of the determination by an immigration judge. (Third Langlois Dec. ¶ 6.)

On November 10, 2025, the Immigration Court notified Rodriguez-Acurio that she would have a hearing before an immigration judge on November 12, 2025 concerning her request for review of the negative credible fear determination. (Fourth Langlois Decl. ¶ 15; ECF No. 21-2 at 12.)

## II.    Procedural History

As noted, Rodriguez-Acurio filed the instant Petition seeking a writ of habeas corpus directing Respondents to release her from detention on October 29, 2025 at 9:22 p.m. following her detention earlier that day. (*See* Pet.) In support of the Petition, Rodriguez-Acurio filed five exhibits. (Pet., Exs. A–E.) She also filed a proposed Order to Show Cause that would direct Respondents to show why "the relief sought should not be granted." (ECF No. 2.)

On October 30, 2025, the Court ordered that the Respondents show cause why the Petition should not be granted and ordered that Rodriguez-Acurio not be removed from the United States or from the Eastern District of New York, the Southern District of New York, or the District of New Jersey absent further order of this Court. (ECF No. 9.)

Respondents submitted their response in opposition to the Petition on November 3, 2025, which included the First Langlois Declaration and two attached exhibits. (*See* Resp.; First Langois Decl.) The Court ordered the parties to appear for a telephone conference later that afternoon to address Rodriguez-Acurio's detention at 26 Federal Plaza. (Elec. Order, Nov. 3, 2025.) At the conference, the Court notified the parties of the preliminary injunction in *Barco*

*Mercado v. Noem*, No. 25-cv-6568 (S.D.N.Y. Sept. 17, 2025), ECF No. 97, which governs conditions of confinement for people held in ICE detention at 26 Federal Plaza, and ordered Respondents to file an affidavit addressing whether Rodriguez-Acurio's detention at 26 Federal Plaza complied with the requirements set forth in the preliminary injunction. (Min. Entry, Nov. 3, 2025.) Respondents filed the Joyce Declaration in response to that order on November 4, 2025. (ECF No. 15.)

On November 5, 2025, the Court ordered Respondents to file the Notice and Order of Expedited Removal, Form I-860 because Respondents had not included it with their opposition to the Petition. (Elec. Order, Nov. 5, 2025.) Later that day, Respondents filed a status report informing the Court that Rodriguez-Acurio had been transferred to the Elizabeth Contract Detention Facility. (ECF No. 16.)

On November 6, 2025, Respondents filed the Second Langlois Declaration and the Form I-860. (ECF Nos. 18, 18-1.) On that same day, Rodriguez-Acurio filed a reply brief in response to Respondents' opposition. (Pet.'s Reply to Resps.' Opp'n ("Reply"), ECF No. 17.)

The Court held a show cause hearing on the Petition on November 7, 2025 (the "Show Cause Hearing"). (Min. Entry, Nov. 7, 2025.) Thirteen minutes before the start of that hearing, Respondents filed the Third Langlois Declaration along with the attached Record of Negative Credible Fear Finding. (Third Langlois Decl., ECF No. 19; ECF No. 19-1.) At the end of the hearing, the Court ordered the parties to appear for a telephone conference on November 8, 2025. (Min. Entry, Nov. 7, 2025.)

On November 8, 2025, the Court issued an order, which the Court amended at its telephone conference later that day, requiring the parties to supplement the record with any documents showing: (1) the scheduling of any ICE check-ins for Rodriguez-Acurio between her

14

October 21, 2021 parole check-in and her credible fear interview on October 29, 2025, (2) what transpired at any such check-ins, including the October 21, 2021 check-in, and (3) all paperwork provided to Rodriguez-Acurio related to any such ICE check-in, including but not limited to the October 21, 2021 check-in. (Elec. Order, Nov. 8, 2025; Min. Entry, Nov. 8. 2025.) The Court also ordered Respondents to file an affidavit addressing what was communicated to Rodriguez-Acurio during the October 21, 2021 check-in, whether any other check-ins were scheduled and, if so, how she was provided notice and what was communicated to her during any such check-ins, and what documentation was provided to her during or after any check-ins. (Elec. Order, Nov. 8, 2025; Min. Entry, Nov. 8. 2025.) At the November 8, 2025 telephone conference, the Court heard additional argument from the parties. (Min. Entry, Nov. 8. 2025.)

On November 10, 2025, the parties provided the submissions in response to the Court's November 8, 2025 Order. (ECF Nos. 20, 21.) Respondents submitted the Fourth Langlois Declaration. (ECF No. 21.) Rodriguez-Acurio provided a copy of her employment authorization card and the notice of her October 30, 2024 biometrics appointment. (ECF Nos. 20-1, 20-2.)

Later on November 10, 2025, the Court held a telephone conference where it heard additional argument from the parties. (Min. Entry, Nov. 10, 2025.) After hearing argument, the Court granted Rodriguez-Acurio habeas relief for the reasons explained on the record, which the Court indicated would be set forth in more detail in this written Opinion and Order. (*Id.*) The Court ordered Respondents to transfer Rodriguez-Acurio from the Elizabeth Contract Detention Facility to the Eastern District of New York and to release her immediately upon effectuating her transfer. (*Id.*) Afterwards, at the joint request of the parties, the Court amended its oral order to require that Respondents release Rodriguez-Acurio from the Elizabeth Contract Detention Facility in New Jersey upon her family's arrival at that facility that day and to confirm via a

15

filing on the docket that the release had been accomplished that evening. (Elec. Order, Nov. 10, 2025.)

The following day, on November 11, 2025, Respondents filed an untimely certification confirming that Rodriguez-Acurio had been released from custody on November 10, 2025, in accordance with the Court's amended order. (ECF No. 23.)

This Opinion and Order sets forth in more detail the reasons for the Court's order granting Rodriguez-Acurio's habeas petition on November 10, 2025.

## LEGAL STANDARD

Rodriguez-Acurio brings a petition for a writ of habeas corpus under 28 U.S.C. § 2241, which "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or law or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)); *see also Hechavarria v. Sessions*, 891 F.3d 49, 53 (2d Cir. 2018). Federal courts have jurisdiction to hear habeas corpus claims by noncitizens challenging the constitutionality of their detention. *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020); *see also Hechavarria*, 891 F.3d at 53 ("[A]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."). Additionally, "[c]laims that the discretionary process [used to detain someone] . . . was constitutionally flawed are cognizable in federal court on habeas because they fit comfortably within the scope of § 2241." *Velasco Lopez*, 978 F.3d at 850.

## DISCUSSION

### I.    Statutory Framework

#### A.  Section 240 Proceedings vs. Expedited Removal

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

("IIRAIRA"), Congress established the two main processes for removing noncitizens deemed

ineligible to enter or remain in the United States. *See* Pub. L. 104-208, 110 Stat. 3009, 3009-546

(1996); *see also Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 106 (2020).[3] The

"usual removal process" is commonly referred to as "Section 240" and is codified in 8 U.S.C.

§ 1229a. *Thuraissigiam*, 591 U.S. at 108. Section 240 proceedings involve an evidentiary hearing

before an immigration judge, where a noncitizen may "attempt to show that he or she should not

be removed." *Id.*; *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-cv-872, __ F. Supp. 3d __,

2025 WL 2192986, at *3 & n.4 (D.D.C. Aug. 1, 2025) ("*Coalition*"). This process was

established by Congress to create "a 'streamlined' removal process . . . '[f]or illegal aliens

already present in the U.S.'" *Coalition*, 2025 WL 2192986, at *3 (quoting H.R. Rep. 104-469, at

12, 107–08 (1996)). In these proceedings, noncitizens have a right to hire counsel, to a

reasonable opportunity to examine evidence against them, to present evidence on their own

behalf, and to cross-examine any government witnesses. 8 U.S.C. § 1229a(b)(4)(A)–(B). The

proceedings themselves are recorded, typically take place over the course of multiple hearings

and months, and upon a decision by the immigration judge, either party may appeal to the Board

of Immigration Appeals ("BIA"). *Coalition*, 2025 WL 2192986, at *3; *see also* 8 C.F.R.

---

[3] Unless otherwise indicated, case quotations omit all internal quotation marks, brackets
alterations, and citations.

§§ 1003.1, 1240.15. The BIA's decision may then be appealed to a United States court of appeals. 8 U.S.C. § 1252.

The IIRAIRA also provides a separate track for expedited removal proceedings as set forth in 8 U.S.C. § 1225(b)(1), which "substantially shorten and speed up the removal process." *Make the Rd. New York v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020). Pursuant to the statute, noncitizens who satisfy two criteria may be subject to expedited removal. First, those noncitizens are "inadmissible" to the United States either because they lack proper entry documents or because they engaged in fraud or willfully misrepresented a material fact on their application for admission. 8 U.S.C. § 1225(b)(1)(A)(i); *see id.* § 1182(a)(6)(C), (a)(7) (grounds of inadmissibility). Second, those noncitizens fall into at least one of two provisions of the expedited removal statute: (1) they "[are] arriving in the United States[,]" 8 U.S.C. § 1225(b)(1)(A)(i), and thereby fall into what is known as the "Arriving Aliens Provision"; and/or (2) they "have not been admitted or paroled" into the United States and have "not affirmatively shown" to an immigration officer's satisfaction that they have been "physically present in the United States continuously for [a] 2-year period immediately prior to the date of the determination of inadmissibility[,]" *id.* § 1225(b)(1)(A)(iii)(II), and thereby fall into what is known as the "Designation Provision." *See Make the Rd*, 962 F.3d at 618–19; *Coalition*, 2025 WL 2192986, at *5. The expedited removal statute grants the Attorney General the authority to designate the population of noncitizens who fall under the Designation Provision. 8 U.S.C. § 1225(b)(1)(A)(iii). The Attorney General has since delegated that authority to the Secretary of DHS. *Make the Rd.*, 962 F.3d at 619 & n.1.

Unlike removal orders issued through Section 240 proceedings, expedited removal orders are "usually issued within a few days, if not hours." *Make the Rd. New York v. Noem*, No. 25-cv-

190, __ F. Supp. 3d __, 2025 WL 2494908, at *3 (D.D.C. Aug. 29, 2025). In these proceedings, the initial fact finder is an immigration officer, not an immigration judge. 8 C.F.R. § 235.3(b)(2)(i). This officer asks the noncitizen a series of questions to determine their inadmissibility and whether they intend to apply for asylum or express a fear of prosecution or torture or a fear of returning to their country of origin. *Id.* § 235.3(b)(2)(i), (b)(4); *Coalition*, 2025 WL 2192986, at *3. If the noncitizen is inadmissible and does not indicate an intent to apply for asylum or express a fear of prosecution or torture or fear of returning to their country of origin, the officer issues a Notice and Order of Expedited Removal; the noncitizen may respond in a sworn statement, and once a supervising officer reviews and approves the determination of inadmissibility, the noncitizen is ordered removed. *Coalition*, 2025 WL 2192986, at *3. If the noncitizen expresses an intent to apply for asylum or a fear of prosecution, the inspecting officer must refer the noncitizen for a "credible fear interview" before a USCIS asylum officer. 8 C.F.R. § 208.30(b), 235.3(b)(4). The asylum officer shall conduct this interview "either at a port of entry or such other place designated by the Attorney General." 8 U.S.C. § 1225(b)(1)(B)(i). Alternatively, if "in exercising USCIS's discretion, it is determined that circumstances so warrant, the asylum officer, after supervisory concurrence, may refer the alien for proceedings under section 240 of the Act [8 U.S.C. § 1229a] without making a credible fear determination." 8 C.F.R. § 208.30(b).

If the noncitizen is referred for a credible fear interview and the asylum officer finds the noncitizen to have a credible fear of persecution or torture, USCIS has "complete discretion" to either issue a Notice to Appear for full consideration of the asylum and withholding of removal claim in Section 240 proceedings or to "retain jurisdiction over the application for asylum." *Id.* § 208.30(f); *see Coalition*, 2025 WL 2192986, at *3 (summarizing these procedures). If USCIS

retains jurisdiction, USCIS "shall conduct" an asylum interview "within 45 days of the applicant being served with a positive credible fear determination." 8 C.F.R. § 208.9(a)(1); *see also id.* § 208.2(a)(ii) (directing that asylum interviews are governed by the procedures in 8 C.F.R. § 208.9). Except in exigent circumstances, applications for extensions of time to file evidence will not be granted that "would prevent a decision from being issued on the application within 60 days of service of the positive credible fear determination." *Id.* § 209.9(e)(2).

If, however, the USCIS asylum officer makes a negative credible fear determination, a different procedure ensues, which involves review by a supervisory asylum officer and the availability of review by an immigration judge before the expedited removal determination becomes final. *Id.* § 208.30(e)(8), (g). This review "shall be conducted as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the [negative credible fear] determination." 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

### B. Detention Pursuant to Section 1226

Section 1226 governs the detention of noncitizens "*already in the country* pending the outcome of removal proceedings." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018) (emphasis added); *see also id.* at 288, (explaining that, "*once inside* the United States . . . an alien *present in the country* may still be removed" under "Section 1226" (emphasis added)). Section 1226 distinguishes between "two different categories" of detention under the statute. *Id.* at 288.

The first category is "a discretionary detention framework" established by Section 1226(a). *Lopez Benitez v. Francis*, No. 25-cv-5937, 2025 WL 2371588, at *3 (S.D.N.Y. Aug. 13, 2025). Section 1226(a) provides that, for a noncitizen who is "arrested and detained" "[o]n a warrant issued by the Attorney General," the Attorney General: (1) "may continue to detain" the

arrested noncitizen; (2) "may release" the noncitizen on "bond"; or (3) "may release" the noncitizen on "conditional parole." 8 U.S.C. § 1226(a)(1)–(2).

The second category is a mandatory detention framework established by Section 1226(c), which "carves out a statutory category of [noncitizens] who may *not* be released" on bond or conditional parole pending the conclusion of removal proceedings. *Jennings*, 583 U.S. at 289 (emphasis in original). Specifically, Section 1226(c) provides that the "Attorney General shall take into custody any alien" who falls into one of five enumerated categories involving criminal offenses and terrorist activities. 8 U.S.C. § 1226(c)(1).

### C.  Mandatory Detention Under Section 1225(b)

Section 1225 enumerates the procedures by which the government must mandatorily detain certain "applicants for admission" into the United States. 8 U.S.C. § 1225(a)(1); *see also Jennings*, 583 U.S. at 287–89. It defines an "applicant for admission" as a noncitizen "present in the United States who has not been admitted or who arrived in the United States." 8 U.S.C. § 1225(a)(1). "Admission" is defined by the INA as "the lawful entry of the alien into the United States after inspection and authorization by the immigration officer." 8 U.S.C. § 1101(a)(13)(A). "The term 'applicant for admission' is . . . something of a misnomer. It doesn't require an application of any sort. All that's needed is presence without admission—in other words, it applies to the great number of undocumented immigrants who currently live in this country." *Huamani v. Francis*, No. 25-cv-8110, 2025 WL 3079014, at *3 (S.D.N.Y. Nov. 4, 2025).

Section 1225(b) requires mandatory detention for two specific groups of "applicants for admission." *See* 8 U.S.C. § 1225(b)(1), (2). First, under Section 1225(b)(1), people subject to expedited removal are subject to mandatory detention. As set out above, Section 1225(b)(1) governs noncitizens: (1) who are inadmissible for lack of proper entry documents or because

they engaged in fraud or a willful misrepresentation of a fact on their application for admission;

*and* (2) who fall within either the "Arriving Aliens Provision" or the "Designation Provision."

*See* 8 U.S.C. § 1225(b)(1)(A)(i), (iii)(II); *see supra* Discussion § I.A. Section

1225(b)(1)(B)(iii)(IV) provides that any noncitizen "subject to the procedures under this clause

*shall* be detained pending a final determination of credible fear of prosecution and, if found not

to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV) (emphasis added); *see also*

*id.* § 1225(b)(1)(B)(ii) (directing that if the immigration officer determines that a noncitizen

subject to expedited removal "has a credible fear of persecution . . . the alien *shall* be detained

for further consideration of the application for asylum" (emphasis added)).

Second, under Section 1225(b)(2), mandatory detention also applies to an applicant for

admission who is "seeking admission" and determined by an immigration officer to not be

"clearly and beyond a doubt entitled to be admitted," with the exception of any crewman,

stowaway, or noncitizen not covered by the expedited removal provision. *Id.* § 1225(b)(2)(A).

Falling within this provision, for example, are:

> noncitizens who are arriving in the United States, seeking admission, and are
> inadmissible for some reason other than misrepresentation or failure to meet document
> requirements (such as those having certain types of criminal convictions or those who
> would pose a foreign policy risk or are associated with terrorists, the Communist party, or
> Nazi activity).

*Valencia Zapata v. Kaiser*, No. 25-cv-7492, 2025 WL 2741654, at *4 (N.D. Cal. Sept. 26, 2025)

(citing 8 U.S.C. § 1182(a)(2)–(3)).

Under the "plain meaning" of Section 1225(b)(1) and (b)(2), detention under Section

1225(b)(1) "must continue until immigration officers have finished 'consider[ing]' the

application for asylum," while detention under Section 1225(b)(2) must continue "until removal

proceedings have concluded." *Jennings*, 583 U.S. at 299 (citing 8 U.S.C. § 1225(b)(1)(B)(ii),

22

(b)(2)(A)). With the exception of temporary parole under Section 1182(d)(5)(A), "there are no

other circumstances under which aliens detained under [Section] 1225(b) may be released."

*Jennings*, 583 U.S. at 300. Accordingly, "[b]oth provisions mandate detention until a certain

point and authorize release prior to that point only under limited circumstances." *Id.* at 301.

     D.  Parole Pursuant to Section 1182(d)(5)(A)

As noted, an applicant for admission detained under Section 1225(b)(1) or (b)(2) "may

be temporarily released on parole 'for urgent humanitarian reasons or significant public

benefit,'" pursuant to Section 1182(d)(5)(A). *Jennings*, 583 U.S. at 288. Under that statute, the

Secretary of Homeland Security may, except in circumstances not relevant here, "in his

discretion parole into the United States temporarily under such conditions as he may prescribe

only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any

alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

Parole is "not [to] be regarded as an admission of the alien[,] and when the purposes of

such parole. . . have been served," Section 1182(d)(5)(A) mandates that "the alien shall forthwith

return or be returned to the custody from which he was paroled." *Id.* Thereafter the parolee's

case "shall continue to be dealt with in the same manner as that of any other applicant for

admission to the United States." *Id.* "In other words, the United States accepts an alien paroled

under § 1182(d)(5)(A) into the country for as long as the humanitarian or public benefit purpose

persists." *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011). Moreover, when a

noncitizen's parole is terminated automatically by the "expiration of the time for which parole

was authorized," if the "exclusion, deportation, or removal order cannot be executed within a

reasonable time, the alien shall again be released on parole unless . . . public interest requires that

the alien be continued in custody." 8 C.F.R. § 212.5(e)(1)–(2).

Parole pursuant to Section 1182(d)(5)(A) serves a unique function. Although Section 1182(d)(5)(A) "does not grant . . . 'admission' to the United States," it "allows the executive to permit certain aliens 'on a case-by-case basis' to enter or remain in this country only for 'urgent humanitarian reasons or significant public benefit.'" *Cruz-Miguel*, 650 F.3d at 198. Accordingly, a Section 1182(d)(5)(A) parolee's "physical presence within the United States cannot be said to be unlawful or illegal because it is authorized by the Attorney General, and parole has long been understood to constitute lawful status." *United States v. Balde*, 943 F.3d 73, 84 (2d. Cir. 2019). As a result, noncitizens "paroled into the United States" under Section 1182(d)(5)(A): (1) may be eligible to access certain Federal public benefits (if paroled into the United States for a period of at least one year), 8 U.S.C. §§ 1611(a), 1641(b)(4); (2) can apply for adjustment of status under 8 U.S.C. § 1255(a); and (3) can seek employment authorization, 8 C.F.R. § 274a.12(c)(11). That distinguishes parole into the United States under Section 1182(d)(5)(A) from release on "conditional parole" under Section 1226(a)(2)(B). *Cruz-Miguel*, 650 F.3d at 198 (holding that the two forms of parole serve "distinct functions" and recognizing that Section 1182(d)(5)(A) parolees are eligible for work authorization and adjustment of status, but noncitizens granted conditional parole under Section 1226(a)(2)(B) are not). Unlike parole under Section 1182(d)(5)(A), conditional parole does not "mean that the alien has been accepted into the country, even temporarily" and "merely permits an alien to remain at liberty based upon a determination that he poses no risk of danger or flight *while his removal is actively sought*." *Id.* (emphasis in original).

## II.    Analysis

Rodriguez-Acurio seeks a writ of habeas corpus or a preliminary injunction "directing Respondents to immediately release [her], or at minimum afford her a bond hearing." (Pet. at

12.) She offers two grounds in support of the petition. First, she argues that her detention violates her procedural due process rights under the Fifth Amendment to the United States Constitution because she was arrested and detained by ICE following her credible fear interview without any notice or opportunity to be heard. (Pet. ¶¶ 26–31.) Second, she argues that her detention without a bond hearing violates Section 1226(a). (*Id.* ¶¶ 32–35.)

In response, Respondents make three arguments. First, they argue that Rodriguez-Acurio's detention is governed by the mandatory detention provisions of Section 1225, not the Section 1226 discretionary detention framework. (Resp. at 13–23.) Second, they contend that courts apply an "entry fiction" to claims by noncitizens whereby the only procedural due process rights that noncitizens like Rodriguez-Acurio possess are those that Congress has provided by statute. (*Id.* at 10–12.) Finally, Respondents argue that even if the Court finds that Respondents violated Rodriguez-Acurio's rights under the Fifth Amendment Due Process Clause and Section 1226, the proper remedy is to require a bond hearing before an immigration judge as opposed to release. (Hr'g Tr. 22:4–23:11.)

For the reasons explained below, contrary to Respondents' contentions, Rodriguez-Acurio's detention does not fall under the mandatory detention provision of either Section 1225(b)(1) and (b)(2) based on the statutory text. Accordingly, Rodriguez-Acurio is necessarily detained pursuant to Section 1226(a), and her detention by ICE without any notice or opportunity to be heard violates her rights to procedural due process under the Fifth Amendment. Considering Rodriguez-Acurio's weighty liberty interests alongside Respondents' interests in enforcing immigration laws and the substantial risk of erroneous deprivation stemming from ICE's arrest and detention of Rodriguez-Acurio without any notice or opportunity to be heard, Rodriguez-Acurio's detention violates her right to procedural due process.

25

A.  Rodriguez-Acurio is Not Detained Under Section 1225(b)

Respondents argue that Rodriguez's detention is lawful because she is detained under the

mandatory detention provisions of Section 1225(b). Although their arguments are imprecise and

shifting, Respondents primarily invoke Section 1225(b)(1) as the basis for mandatory detention

and rely on Section 1225(b)(2) as a "catchall" basis for detention should the Court find that

Section 1225(b)(1) does not apply. (Hr'g Tr. 13:17–14:8, 25:8–25, 31:1–5.)

The inconsistencies in Respondents' position are notable because, combined with

Respondents' inability explain why Rodriguez-Acurio was not detained for three years while

purportedly subject to mandatory detention, they call into question the basis for Rodriguez-

Acurio's detention. The inconsistencies in Respondents' position include the following:

- In their briefing, Respondents invoke both Section 1225(b)(1) and (b)(2) but do so inconsistently. (*See, e.g.*, Resp. at 9 ("After her interview, Petitioner was detained by ICE pursuant to 8 C.F.R. § 235.3(b)(2)(iii) and 8 U.S.C. § 1225(b)(1)"); *id.* at 13 ("Petitioner falls squarely within the ambit of § 1225(b)(2)'s mandatory detention requirement.")

- At the November 7, 2025 Show Cause hearing on Rodriguez-Acurio's habeas petition, Respondents generally invoked Section 1225(b)(1) as the basis for her detention but, in response to the Court's questions, could not clearly identify whether they were invoking the Designation Provision or the Arriving Aliens Provision. (*See, e.g.*, Hr'g Tr. 13:11–16, 14:9–14.)[4]

---

[4] For example, initially Respondents argued that "[Rodriguez-Acurio] would fall under [Section 1225](b)(1)([A])([ii]) [because] she was inadmissible pursuant to 1182(a)(7)." (Hr'g Tr. 13:11–16; *see also id.* 14:9–14 ("Your Honor,  . . . It's the fact that she was detained in the country, she did not have any papers . . . and, therefore, she was deemed inadmissible in 1182 and placed into expedited removal proceedings.").)

However, Section 1225(b)(1)(A)(ii) provides that a noncitizen who is inadmissible on one of two grounds *and* is either "an alien . . . who is arriving in the United States *or* is described in [the Designation Provision]" shall be referred for an interview by an asylum officer if the noncitizen expresses an intent to apply for asylum or a fear of persecution. 8 U.S.C. § 1225(b)(1)(A)(ii) (emphasis added). Respondents' invocation of Section 1225(b)(1)(A)(ii) thus does not establish whether Rodriguez-Acurio was detained under the Arriving Aliens provision or the Designation

- Eventually, Respondents stated that Rodriguez-Acurio was detained under the Designation Provision of Section 1225(b)(1) and *not* the Arriving Aliens Provision of Section 1225(b)(1) or the mandatory detention provision set forth in Section 1225(b)(2). (Hr'g Tr. 13:17–14:8 (invoking Section 1225(b)(1) and not (b)(2)), 14:9–14 (stating that the "arriving alien issue" was not "relevant here"), 15:4–7 (invoking the Designation Provision).)

- Nonetheless, after the Court twice noted on the record that Respondents had "conceded" that they were not invoking the Arriving Aliens Provision of Section 1225(b)(1), Respondents "walk[ed] back" that concession. (Hr'g Tr. 18:8–12, 25:8–25.)

- Likewise, after having also conceded that they were not invoking Section 1225(b)(2), Respondents later stated that Section 1225(b)(2) served as a "catchall" basis for Rodriguez-Acurio's detention in the event the Court were to find that her detention is not governed by Section 1225(b)(1). (Hr'g Tr. 19:15–18 (noting that Respondents had conceded Section 1225(b)(2) did not apply), 21:15–17 ("[A]lthough we're not arguing it here, if she were not detained under 12[25](b)(1), then our position would be that 1225(b)(2)(a) would apply. But our argument is not that"), 31:1–5 (invoking Section 1225(b)(2) as a "catchall").)

Notwithstanding the inconsistencies in their justifications for Rodriguez-Acurio's detention, Respondents argue that no matter which provision of the INA authorizes her detention, Rodriguez-Acurio does not have a right to procedural due process, beyond those rights protected by Section 1225(b), as a noncitizen who is an applicant for admission. (Resp. at 10–13.)

Respondents' arguments are unpersuasive. For the reasons explained below, the record demonstrates that Rodriguez-Acurio is detained pursuant to Section 1226(a)—not the Designation Provision or the Arriving Aliens Provision of Section 1225(b)(1) or Section 1225(b)(2). Moreover, Respondents failed to afford Rodriguez-Acurio notice and an opportunity to be heard before she was arrested and detained by ICE on October 29, 2025. Balancing the

---

Provision. Likewise, although Section 1182(a)(7) is referenced within Section 1225(b)(1), it governs the documentation requirements for admission and is not part of the expedited removal statute. *See id.* § 1182(a)(7).

three *Mathews v. Eldridge*, 424 U.S. 319 (1976), factors considered in evaluating procedural due process claims—the private interest at stake, the risk of erroneous deprivation, and the government's interests—Rodriguez-Acurio's detention violates her Fifth Amendment right to procedural due process.

### i. *Section 1225(b)(1)*

Respondents argue that Rodriguez-Acurio's detention is mandated by Section 1225(b)(1), which governs expedited removal and detention pending a final determination of those proceedings. (Resp. at 1.) Rodriguez-Acurio's briefing does not specifically address whether she falls within the text of Section 1225(b)(1) and instead focuses on the text of 1225(b)(2) and Respondents' argument that her claim is barred by the so-called entry fiction. (Reply at 2–7 (arguing that the "entry fiction" is a "narrow exception" that does not apply to Rodriguez-Acurio); *id.* at 7–12 (arguing that Rodriguez-Acurio's detention is not governed by Section 1225(b)(2)).)

This Court holds that neither the Arriving Aliens Provision nor the Designation Provision of Section 1225(b)(1) authorizes expedited removal and the detention of noncitizens who, like Rodriguez-Acurio, were paroled into the United States under Section 1182(d)(5)(A). In doing so, it joins other district courts that have reached this same conclusion. *See Coalition*, 2025 WL 2192986, at *22, 30 (concluding that Section 1225(b)(1) "forbids the expedited removal of noncitizens who have been, *at any point in time*, paroled into the United States" because "the only way to make sense of the statutory scheme Congress created is to see that parolees fall under neither [provision of Section 1225(b)(1)]" and that "[a]ny other result conflicts with other aspects of the statute and regulations, Congress's evident purpose, and the ordinary meaning of the statute's words"); *Bustos v. Raycraft*, No. 25-cv-13202, 2025 WL 3022294, at *6 (E.D. Mich.

Oct. 29, 2025) (finding that a noncitizen who unlawfully entered the country, was paroled into the United States, and received a negative credible fear designation was not subject to expedited removal and detention despite the expiration of temporary parole); *Munoz Materano v. Arteta*, No. 25-cv-6137, 2025 WL 2630826, at *11 (S.D.N.Y. Sept. 12, 2025); *Aviles-Mena v. Kaiser*, No. 25-cv-6783, 2025 WL 2578215, at *4 (N.D. Cal. Sept. 5, 2025). To be sure, none of these decisions by other district judges is binding here. This Court, as always in the absence of a governing Supreme Court or Second Circuit decision, makes its own independent assessment of whether Section 1225(b)(1) or (b)(2) or Section 1226 applies to Rodriguez-Acurio.

### 1. The Designation Provision of Section 1225(b)(1)(A)(iii) Does not Apply to Rodriguez-Acurio

In their briefing, Respondents do not argue that the Designation Provision imposes mandatory detention on Rodriguez-Acurio. Nonetheless, at the Show Cause Hearing, Respondents asserted, for the first time, that Section 1225(b)(1)(iii)(II) served as the primary basis for Rodriguez-Acurio's detention. (Hr'g Tr. 13:17–14:8, 15:4–7, 21:15–17.) As discussed, that provision, in relevant part, authorizes the Secretary of Homeland Security, as the Attorney General's delegate, to designate as eligible for expedited removal any

> alien . . . *who has not been admitted or paroled into the United States*, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility . . .

8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added).

No one disputes that Rodriguez-Acurio was not continuously physically present in the United States for the 2-year period immediately prior to September 6, 2021, when she was determined to be inadmissible. (*See* Form I-860; Reply at 1 (acknowledging that the "facts of this case are undisputed").) Rodriguez-Acurio also does not appear to dispute that she was detained

on September 6, 2021 under Section 1225(b)(1). (*Id.*; Reply at 1.) Instead, the critical question is

whether the Designation Provision authorizes expedited removal of Rodriguez-Acurio, and

thereby mandatory detention, when she was previously "paroled into the United States" and,

following the termination of parole, resided continuously in the United States for more than three

years, was granted work authorization, and was handled through the asylum process for some

period of time.

As with any question of statutory interpretation, this question "begins with [the statute's

text], read coherently and in context" and "given the meaning that proper grammar and usage

would assign them." *Yupangui-Yunga v. Bondi*, No. 23-6522-cv, __ F.4th __, 2025 WL 2989588,

at *5, 7 (2d Cir. Oct. 24, 2025); *see also Greathouse v. JHS, Sec. Inc.*, 784 F.3d 105, 111 (2015)

(holding that a statute "should be enforced according to its plain and unambiguous meaning,"

which is "determined by reference to the language itself, the specific context in which that

language is used, and the broader context of the statute as a whole"). "If the meaning is plain, the

inquiry ends there." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016). When the plain

text of a statute is ambiguous, however, a court must apply "canons of statutory construction for

assistance in interpreting the statute." *Id.* The court may "resort to legislative history only if, after

consulting canons of statutory [construction], the meaning remains ambiguous." *Id.* (citing

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005)); *see United States v.*

*Peterson*, 394 F.3d 98, 105 (2d Cir. 2005) ("[E]ven if the statute were ambiguous, we would

look to traditional canons of statutory construction to resolve the ambiguity, before looking to

legislative history and interpretive regulations."). If the canons of statutory interpretation and

legislative history do not resolve the ambiguity, the court will "afford[] some degree of weight to

the interpretations of the agencies charged with enforcing [the statute]." *Greathouse*, 784 F.3d at 113.

The issue here hinges on the meaning of the phrase "who has not been . . . paroled into the United States" in 8 U.S.C. § 1225(b)(1)(A)(iii)(II). Respondents argue that once a noncitizen's parole has ended, the individual has no longer "been paroled into the United States." But the statutory text does not read that a noncitizen is eligible for expedited removal if that person "*is* not currently on parole." Instead, it ties the ability to be designated for expedited removal to whether the noncitizen "has not *been* . . . paroled," leaving open the possibility that "whether a noncitizen's parole is active, or has expired or been terminated, does not matter." *Coalition*, 2025 WL 2192986, at *22; *see also Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) ("Congress's use of the present perfect tense—'has . . . been admitted'—is significant here . . . Use of this tense evinces Congress's intent to include any previous admission . . . including admission in the indefinite past." (first ellipses in original)).

Nonetheless, the meaning of the  phrase "has not been . . . paroled into the United States" remains ambiguous because, as the court reasoned in *Coalition*, the Supreme Court has elsewhere indicated that the meaning of a "has not been" grammatical construction—what is referred to as the "negative form of the present-perfect tense"—depends on the "way in which the phrase at issue [is] used" in the statute, the adjacent statutory language, and any "background principles." *Coalition*, 2025 WL 2192986, at *22 (citing *Hewitt v. United States*, 145 S. Ct. 2165, 2172 (2025) (holding that a criminal sentence that "has not been imposed" is a criminal sentence that has no "continued legal validity")). In fact, in *Dobrova*, although the Second Circuit held that the use of a "has been" statutory construction can show an intent to consider whether a legal status was held "at any time in the indefinite past," it acknowledged that this

31

language can *also* refer to whether a past status "has continuing legal relevance." 607 F.3d at 301–02. For example, in that case, the relevant statutory clause was the phrase, "has *previously* been admitted to the United States as an alien lawfully admitted for permanent residence." *Id.* at 300–02 (quoting 8 U.S.C. § 1182(h)) (emphasis added). The Second Circuit concluded that because a person's lawful permanent residence status terminates upon final removal, the term "previously" helped "clarifi[y] that the statute does not apply only to aliens who were and still are admitted as [lawful permanent residents]." *Dobrova*, 607 F.3d at 302.

In light of the ambiguity in the phrase "has not been . . . paroled into the United States," this Court considers adjacent statutory terms and the context of the entire statutory scheme to determine the best reading of the statute. This Court agrees with *Coalition* that the statutory text of the Designation Provision prohibits "the expedited removal of noncitizens who have been, at any point in time, paroled into the United States." *Coalition*, 2025 WL 2192986, at *22; *see also Salgado Bustos,* 2025 WL 3022294, at *6 (reaching the same conclusion and holding that "[n]umerous courts have rejected Respondents' interpretation of [Section 1225(b)(1)]"); *Munoz Materano*, 2025 WL 2630826, at *11 (applying *Coalition*'s interpretation of Section 1225(b)(1)); *Aviles-Mena*, 2025 WL 2578215, at *4 (same).

First, as the court reasoned in *Coalition*, the "meaning of 'paroled' is elucidated by its association with 'admitted.'" 2025 WL 2192986, at *23; *see* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (referring to an "alien . . . who has not been *admitted* or paroled into the United States" (emphasis added)). Whereas the term "'parole,' . . . can refer to 'both a manner of entry [into the country] and a status[,]' . . . when accompanied by 'admitted,' which refers only to a manner of entry, 'paroled' likely refers to a manner of entry, too." *Coalition*, 2025 WL 2192986, at *23; *see also Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). Accordingly, the clause "admitted or

paroled" does not refer to a legal status but rather to the event of entry into the United States via admission or parole, which either did or did not occur.

This conclusion is further supported by the ordinary meaning of the preposition "into" in the phrase "has not been . . . paroled *into* the United States," which conveys entrance inside of a location, rather than a status. 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (emphasis added).[5] In line with this ordinary meaning, Second Circuit decisions hold that humanitarian parole under Section 1182(d)(5)(A) is a distinct legal concept that governs parole "into the United States." *See Cruz-Miguel*, 650 F.3d at 198–99 ("parole into the United States" does not include "conditional parole" under Section 1226(a)(2)(B) because humanitarian parole permits a noncitizen "to *enter* or remain in this country," but conditional parole "does not mean that the alien has been accepted into the country, even temporarily" (emphasis added)); *Balde*, 943 F.3d at 85–86 ("supervised release" is not "parole[] into the country within the meaning of 8 U.S.C. § 1182(d)(5)(A)"). Whereas other forms of parole are more akin to "bail release" during the time period in which "removal is actively sought," *Cruz-Miguel*, 650 F.3d at 198, a person paroled under Section 1182(d)(5)(A) is temporarily "authorized to *come into* the United States," *Balde*, 943 F.3d at 84 (quoting *Matter of Castillo-Padilla*, 25 I. & N. Dec. 257, 259 (B.I.A. 2010)) (emphasis added).

---

[5] In *Leng May Ma v. Barber*, 357 U.S. 185 (1958), the Supreme Court held that a person paroled into the United States under Section 1182(d)(5)(A) was not considered to be "within the United States." However, that decision interpreted a since-repealed provision of the INA and therefore is not instructive concerning the interpretation of the phrase "has not been . . . paroled into the United States" in 8 U.S.C. § 1225(b)(1)(A)(iii)(II). *Leng May Ma*, 357 U.S. at 186–188. Moreover, the question in *Leng May Ma* was whether parole "somehow effects a change in [an] alien's legal status," not whether parole is a method of entry into the United States, and the Supreme Court concluded that detention does not "constitute an entry even though [an] alien is physically within the United States." *Id.* at 188. Here, the grant of Section 1182(d)(5)(A) parole to Rodriguez-Acurio released her from detention and allowed her to move from the border to the interior of the country.

As a result, such persons are lawfully present in the United States even as they "do[] not change . . . immigration status" and have not been admitted. *Id.*.[6] For this reason, once a noncitizen is authorized into this country via Section 1182(d)(5)(A) parole, "for at least some purposes, parole has ongoing legal effect even after it expires or is terminated." *Coalition*, 2025 WL 2192986, at *23 (discussing 8 C.F.R. § 245.1(b)(3), which makes any noncitizen "who *was not* . . . paroled [into the United States] following inspection" ineligible for adjustment of status (emphasis added)); *Aviles-Mena*, 2025 WL 2578215, at *4 (agreeing with this analysis).

Rodriguez-Acurio physically entered the United States prior to her parole by crossing the Rio Grande River near Eagle Pass, Texas. (First Langlois Decl. ¶ 3.) It was only shortly afterwards that CBP apprehended her near the port of entry on or about September 4, 2021, inspected and issued her a Notice and Order of Expedited Removal on September 6, 2021, and paroled her into the United States pursuant to Section 1182(d)(5)(A) on September 14, 2025. (*Id.* ¶¶ 3–4, 7; Fourth Langlois Decl. ¶ 9.) Nevertheless, Rodriguez-Acurio's placement in expedited removal was predicated on her classification as an "arriving alien," Fourth Langlois Decl. ¶ 9, ECF No. 21-2, which is consistent with expedited removal's purpose: quickly "screen[ing] out arriving aliens . . . with no significant possibility of establishing a claim to asylum."[7] Because

---

[6] In *Balde*, the Second Circuit explained that although a parolee under Section 1182(d)(5)(A) does not change immigration status in that "[they] remain 'at the border' for the purposes of immigration law and are treated as applicants for admission into the country," parolees are "authorized to *come into*" the country. 943 F.3d at 84 (emphasis added). Accordingly, although a Section 1182(d)(5)(A) parolee remains "at the border" in the sense that they remain an applicant for admission, these parolees have nevertheless entered into the United States by virtue of their parole, as explained in detail in this section. *See* Discussion § II.A.i.1.

[7] Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01, 1997 WL 93131, at *10320 (Mar. 6, 1997) (implementing provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996).

Rodriguez-Acurio's parole served to permit Rodriguez-Acurio to move from the border to the interior of the country, it functionally served to do exactly what its plain text conveys—"parole [her] *into* the United States" and out of expedited removal. 8 U.S.C. § 1182(d)(5)(A) (emphasis added).[8] Thus, once DHS "affirmatively cho[se]" to authorize Rodriguez-Acurio's parole and corresponding release from ICE detention, it "made the determination that it no longer intend[ed] to fast-track [her] removal and that it [would] proceed with the standard removal process under 8 U.S.C. § 1229a." *Aviles-Mena*, 2025 WL 2578215, at *5.

When questioned at the Show Cause Hearing about how the plain text of Section 1225(b)(1)(iii)(II) applied to Rodriguez-Acurio, Respondents initially were "not able to specifically address that point . . . ." (Hr'g Tr. 18:13–19:18.) Later, after having a "moment to consider it," Respondents argued that Section 1225(b)(1)(iii)(II) applied to Rodriguez-Acurio because her parole expired more than three years before Respondents detained her. (Hr'g Tr. 19:21–20:4.) Respondents failed to connect their argument to the text of Section 1225(b)(1)(iii)(II), and instead argued that Rodriguez-Acurio falls under the Designation Provision because, notwithstanding her release on humanitarian parole, "it's effectively the same as if she was still at the border"—the so-called "entry fiction." (Hr'g Tr. 17:5–19.) They contend

---

[8] This understanding of the impact of granting Rodriguez-Acurio Section 1182(d)(5)(A) parole is also consistent with the legislative history of IIRAIRA. Prior to IIRAIRA's enactment, the INA subjected noncitizens who "entered the United States without inspection" to deportation and prohibited those "already physically present in the United States" from seeking humanitarian parole. *Cruz-Miguel*, 650 F.3d at 198. Following IIRAIRA, however, "both aliens arriving at the border and aliens already present without inspection are deemed 'applicants for admission,' 8 U.S.C. § 1225(a)(1), who must be 'inspected by immigration officers.'" *Id.* at 197. Accordingly, in contrast to "the pre-IIRAIRA regime, even aliens already physically present in the United States who, upon inspection, are placed in removal proceedings, may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A)." *Id.* at 198. Respondents admit that Rodriguez-Acurio was inspected several days prior to her parole into the United States. (Fourth Langlois Decl. ¶ 9.)

that "after discretionary parole expires, the alien is restored to the status that he had at the time of parole." (Resp. at 15.) In support, they rely on the text of Section 1182(2)(5)(A) and 8 C.F.R § 212.5(e)(2)(i), and several cases standing for the proposition that "parole is not an admission into the United States and . . . is treated for constitutional purposes 'as if stopped at the border.'" (*Id.* (citing *Thuraissigiam*, 591 U.S. at 114 and other cases).)

However, the cases on which Respondents rely, including *Department of Homeland Security v. Thuraissigiam*, are inapposite for the reasons addressed below in Section II.B.i. Moreover, the statutory authority on which Respondents rely does not establish the principle they wish to assert for the following reasons. First, as the court in *Coalition* explained, Section 1182(d)(5)(A) does not say that parolees "return, upon the termination or expiration of their parole, to the position of an applicant for admission standing at the threshold of entry." 2025 WL 2192986, at *24. Nor does it say that they are "restored to the status that [they] had at the time of parole." (Resp. at 15.) "Rather, the provision says that two things happen to a noncitizen following expiration of parole: (1) he 'shall forthwith return or be returned to the custody from which he was paroled'; and (2) 'thereafter his case shall *continue to be dealt with* in the same manner as that of any other *applicant for admission* to the United States.'" *Coalition*, 2025 WL 2192986, at *24 (quoting 8 U.S.C. § 1182(d)(5)(A) (emphasis added)). All the term "applicant for admission" requires is presence in the United States without admission. *See Huamani*, 2025 WL 3079014, at *3. Thus, Section 1182(d)(5)(A) suggests that rather than reverting to any prior status, a noncitizen whose parole has expired is treated like the vast majority of undocumented immigrants currently living in this country who are not subjected to expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II) (permitting the Attorney General to designate for expedited removal only those noncitizens who have not been admitted or paroled and have not been

36

"physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility.").

Second, the clause in Section 1182(d)(5)(A) directing that parolees "shall forthwith return or be returned to the custody from which [they were] paroled" does not place Rodriguez-Acurio within the Designation Provision either. *See* 8 U.S.C. § 1182(d)(5)(A). The Supreme Court has confirmed that "nothing in this text [of Section 1182(d)(5)(A)] . . . affirmatively authorizes detention," so the statute is not an independent authority to detain parolees following the expiration of parole. *Clark v. Martinez*, 543 U.S. 371, 385 (2005). To the contrary, the Supreme Court has stressed, "[Section 1182(d)(5)(A)] provides that, when parole is revoked [or expires]" the noncitizen will be returned to the "custody from which he was paroled and thereafter *his case shall continue to be dealt with in the same manner as that of any other applicant for admission*." *Id.* (emphasis in original).[9] Here, Section 1182(d)(5)(A) may permit Rodriguez-Acurio to be returned to ICE custody, but her case, which necessarily includes the procedures required before detention, "shall continue to be dealt with in the same manner as that of any other applicant for admission," 8 U.S.C. § 1182(d)(5)(A), and any other applicant for admission residing in the United States for more than three years would be detained under Section 1226, *see, e.g.*, *Huamani*, 2025 WL 3079014, at *3 (holding that Section 1226 "governs the process of arresting

---

[9] Relying on the italicized clause in Section 1182(d)(5)(A) to interpret the language regarding return to custody, the Supreme Court in *Clark*, rejected the argument that a habeas petitioner whose humanitarian parole had been revoked and who had been ordered removed, could be detained longer than a 90-day limit set out in Section 1231(a)(6), which is the statute governing the detention and removal of non-citizens ordered removed. *Clark*, 543 U.S. at 385 (2005)*. The Court reasoned that because "[t]he manner in which . . . any other applicant [for admission who had been ordered removed] would be 'dealt with' beyond the 90-day removal period is prescribed by § 1231(a)(6)," the petitioner's detention was governed by Section 1231(a)(6). *Id.* at 386.

and detaining non-citizens who have already entered the United States pending their removal"

(quoting *Jennings*, 583 U.S. at 288)); *Lopez Benitez*, 2025 WL 2371588, at 3 (holding that

"'*once inside* the United States . . . *an alien present in the country* may still be removed' under

Section 1226" (quoting *Jennings*, 583 U.S. at 288)).

Third, Respondents' reliance on 8 C.F.R. § 212.5 is unpersuasive. This regulation

provides that upon expiration of humanitarian parole under Section 1182(d)(5)(A), the noncitizen

"shall be restored to the status that he or she had at the time of parole" *and* that "[a]ny further

inspection or hearing [following expiration of parole] shall be conducted under section 235 or

240." 8 C.F.R. § 212.5(e)(1)–(2). Therefore, as the court reasoned in *Coalition*, this regulation

> is easily read as providing not . . . for either expedited removal or section 240 removal for
> noncitizens whose parole is terminated. Instead, it appears to provide for either inspection
> under section 235 (which can then lead to either expedited or regular removal
> proceedings) or, if the parolee does not require any 'further inspection,' to section 240
> proceedings.

2025 WL 2192986, at *26. Respondents selectively rely on the first part of the regulation

(providing that a noncitizen "shall be restored to the status that he or she had at the time of

parole") while ignoring the second (providing that "[a]ny further inspection or hearing

[following expiration of parole] shall be conducted under section 235 or 240").

Respondents own actions toward Rodriguez-Acurio are consistent with the textual

analysis of Sections 1182(d)(5)(A) and 1225(b)(1)(A)(iii) set forth above, and the resulting

conclusion that the grant of humanitarian parole to Rodriguez-Acurio moved her out of

expedited removal proceedings and related mandatory detention. The record does not include

any facts showing that Respondents made any effort to return Rodriguez-Acurio to ICE detention

at any time between the expiration of her humanitarian parole and until after she had

continuously resided in the United States for more than three years and had applied for, and was

granted, work authorization in 2025. Although Respondents argue that Section 1182(d)(5)(A) required Rodriquez Acurio to "be returned to [] custody," after the expiration of humanitarian parole, they offered no explanation for why they waited until three years after Rodriguez-Acurio's parole ended to arrest and detain her. (Hr'g Tr. 27:1–2 ("I don't know why it took the amount of time that it did.").) In fact, at one point counsel for Respondents incorrectly claimed that there was "no indication that [Respondents] waited for years" to detain Rodriguez-Acurio and it was "not clear they knew where [Rodriguez-Acurio] was located." (*Id.* 27:5–7.) Respondents' own records squarely contradict that assertion, instead showing that Rodriguez-Acurio "reported for . . . every appointment as directed." (Pet. ¶ 18.) She attended the October 21, 2021 ICE-Check, submitted a September 2024 asylum application with USCIS, appeared for an October 2024 fingerprinting application with USCIS, applied for work authorization in June 2025, and secured work authorization from June 2025 through June 2030. (Pet. ¶¶ 17–18; First Langlois Decl. ¶ 11; ECF Nos. 20, 20-1, 20-2.) On October 22, 2025, Respondents also mailed Rodriguez-Acurio a notice of the date and time of her October 29, 2025 credible fear interview. (ECF No. 21-2 at 9–10; Fourth Langlois Decl. ¶ 14.) Moreover, Langlois admits that Respondents decided not to reschedule Rodriguez-Acurio for further check-ins after the October 2021 check-in, "instead deferring to the Asylum Office review process to be completed." (Fourth Langlois Decl. ¶ 13.) Respondents' records also show that Rodrigeuz-Acurio informed the Department of Homeland Security where she was residing even after her temporary parole expired because Rodriguez-Acurio's residential address is set forth on her asylum and work authorization applications and the notices to appear for the USCIS fingerprinting application and the credible fear interview. (ECF Nos. 1-2, 1-4, 1-5, 20-1, 20-2.) The record plainly shows that after Respondents paroled Rodriguez-Acurio into the United States under Section 1182(d)(5)(A),

they treated her as a noncitizen subject to Section 1226 and not as a noncitizen subject to

mandatory detention under any of the applicable provisions of Section 1225(b).[10]

Finally, Respondents argue that the grant of work authorization to Rodriguez-Acurio in

June 2025 has no bearing on the question of whether she is detained pursuant to Section

1225(b)(1)'s Designation Provision because USCIS and ICE are "different agencies" and "don't

necessarily have the same information in each of their systems." (Nov. 10, 2025 Tel. Conf. Tr.

8:18–9:7.) Rather, they frame the grant of work authorization to Rodriguez-Acurio as a mistake

due to USCIS's purported lack of awareness that Rodriguez-Acurio was pending expedited

removal. (*Id.*) This argument is unpersuasive. USCIS and ICE are both part of DHS and all

documentation relating to Rodriguez-Acurio feature her alien number, including her work

authorization application, her asylum application, her Interim Notice Authorizing Parole, and the

---

[10] In their briefing, Respondents frame this analysis as one premised on the doctrine of "equitable estoppel." (*See* Rep. at 21 (arguing that Rodriguez-Acurio's argument that her detention is governed by Section 1226(a) boils down to the contention that "Respondents should be estopped from detaining [Rodriguez-Acurio] as an applicant for admission because they did not do so for more than two years after her parole expired") To be clear, this Court's analysis is nothing of the sort. It is grounded in the dictates of the text of Section 1225(b) and the facts in the record. Respondents fail to show that Rodriguez-Acurio's detention is authorized under the Designation Provision of Section 1225(b)(1), or for the reasons explained below, the Arriving Aliens Provision of Section 1225(b)(1) or the mandatory detention provision of Section 1225(b)(2). Accordingly, Rodriguez-Acurio's detention commencing on October 29, 2025 was carried out under Section 1226(a), and she has a right to procedural due process, which Respondents violated for the reasons discussed below.

This conclusion is also consistent with past DHS practice. I take judicial notice that in *Coalition* the court asked the government if they were "aware of DHS or its predecessors ever applying or subjecting to expedited removal procedures individuals who had been previously paroled but whose parole terminated for whatever reason?" and the government was not initially "aware of any such instance." *Coalition*, No. 25-cv-872 (D.D.C. July 16, 2025), ECF No. 36. After briefing and argument the government identified only two historical instances of individuals being processed for expedited removal, both of which involved noncitizens who had been paroled into the country *for criminal prosecution*—a situation inapposite to the one here. *Id.*

Notice and Order of Expedited Removal. (ECF Nos. 1-2, 1-4, 18-1, 20-2). DHS regulations provide that the inspecting officer who issues the Notice and Order of Expedited Removal "shall not proceed further with removal" until the officer refers any noncitizen who expresses an intention to apply for asylum or a fear of persecution or torture to USCIS for a credible fear interview. *See* 8 C.F.R. § 235.3(b)(4). USCIS then oversees the credible fear review process with USCIS asylum officers conducting these interviews. *See id.* § 208.30(b), (3)(8), (g). USCIS granted Rodriguez-Acurio work authorization and also scheduled—and handled—Rodriguez-Acurio's credible fear interview. Respondents' hypothesis that USCIS's decision to grant Rodriguez-Acurio work authorization was simply an error does not square with the facts.[11]

> ### 2. *Rodriguez-Acurio is not an Arriving Alien Under Section 1225(b)(1)(A)(i)*

As explained above, although Respondents generally argue in their briefing that Section 1225(b) mandates Rodriguez-Acurio's detention, they made no specific argument that the Arriving Alien Provision of Section 1225(b)(1) mandates her detention until the Show Cause Hearing. (Resp. at 1 (arguing for detention under Section 1225(b)(1) generally, without reference to the Arriving Aliens Provision or the Designation Provision); *id.* at 13–14 (arguing that Section 1225(b)(1) applies to "aliens arriving in the United States"); Hr'g Tr. 14:9–10 (Respondents' counsel: "Your Honor, I don't believe the arriving alien issue is relevant here"); *id.* at 18:8–12 (noting Respondents' concession that the Arriving Aliens Provision did not apply); *id.* at 25:8–25

---

[11] Respondents also argue that the work authorization is merely an "ancillary benefit that just comes along with the filing of the [I-589]," so USCIS likely granted Rodriguez-Acurio work authorization because it appeared that she was eligible for it. (Nov. 10, 2025 Tel. Conf. Tr. 4:12–20.) However, Rodriguez-Acurio points out that this characterization fails to acknowledge that work authorization follows a "separate application," which can only be granted after a case for asylum has been "pending for more than six months." (*Id.* 5:12–25.)

(Respondents' counsel "walk[ing] back" concession).) For the following reasons, based on the ordinary meaning of the plain text of the Arriving Alien Provision, Rodriguez-Acurio is not an "arriving alien," and therefore her detention does not fall under Section 1225(b)(1)(A)(i).

As set out above, the Arriving Aliens Provision imposes expedited removal and detention on any noncitizen who is inadmissible due to lack of entry documents or fraud or willful misrepresentation on an admission application *and* "who is arriving in the United States." 8 U.S.C. § 1225(b)(1)(A)(i). The INA "does not define the term 'arriving,'" *Coalition*, 2025 WL 2192986, at *27. As a result, Respondents rely upon 8 C.F.R. § 1.2, which defines an "[a]rriving alien" as:

> an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States . . . An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. . . .

8 C.F.R. § 1.2.[12] Prior to the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Second Circuit exercised deference to a provision within 8 U.S.C. § 1.1(q), the precursor to 8 C.F.R. § 1.2, which provided that "[a]n arriving alien remains such even if paroled pursuant to [INA] section 212(d)(5) . . . ." *Ibragimov v. Gonzales*, 476 F.3d 125, 135–37 & n.17 (2d Cir. 2007) (citing *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984)); *see also Cruz-Miguel*, 650 F.3d at 197 n.14 (similarly relying on 8 C.F.R. § 1.1(q) to conclude that an "arriving alien remains such even if paroled pursuant to 8 U.S.C. § 1182(d)(5)(A)"). Accordingly, in *Ibragimov*, the Second Circuit held that a petitioner who had overstayed his visa and been paroled back into the country was an "arriving alien" because that was his status before

---

[12] 8 C.F.R. § 1.2 excepts from its definition certain individuals who are not at issue here.

he was paroled into the country and then-in force 8 C.F.R. § 1.1(q) "command[ed] that 'an arriving alien *remains such even if paroled*." *Ibragimov*, 476 F.3d at 136 (emphasis in original).

Respondents do not cite *Ibragimov* or address that it was decided before the Supreme Court replaced *Chevron* deference with a new standard in *Loper Bright*. They nevertheless argue, relying on 8 C.F.R. § 1.2, that Rodriguez-Acurio is subject to mandatory detention because CBP originally detained her on September 4, 2021 near a port of entry in Eagle Pass, Texas, and she was later "discretionarily paroled into the United States." (Resp. at 15 (relying on 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 1.2 to argue that a "parolee *remains* both an applicant for admission and an arriving alien" (emphasis in original)).) However, the Second Circuit has not considered the meaning of the term "arriving alien" in 8 U.S.C. § 1225(b)(1)(A)(i) since *Loper Bright*, under which "courts must exercise independent judgment in determining the meaning of statutory provisions" rather than simply deferring to agencies' interpretations of ambiguous statutes. 603 U.S. at 394.

As discussed, a statute "should be enforced according to its plain and unambiguous meaning." *Greathouse*, 784 F.3d at 111; *see also Yupangui-Yunga*, 2025 WL 2989588, at *7; *see also Bondi v. VanDerStok*, 604 U.S. 458, 477 n.4 (2025) (when engaged in statutory interpretation, courts "interpret the words Congress enacted 'consistent with their ordinary meaning'"). Accordingly, this analysis starts with the text of Section 1225(b)(1)(A)(i), which provides that a noncitizen "who is arriving in the United States" and satisfies the other criteria is subject to mandatory detention pending expedited removal. Here the plain meaning of the word "arriving" is being "in the process of reaching" a destination. *Coalition*, 2025 WL 2192986, at *28. Moreover, nothing in Section 1225 suggests that "arriving" is used as a term of art in the clause, "an alien . . . who is arriving in the United States . . . ." *See Coalition*, 2025 WL

43

2192986, at *28 (discussing 8 U.S.C. § 1225(b)(1)(A)(i)). The words "arriving," "arrival," and "arrive" in Section 1225 appear to refer to a process that occurs upon physical entry into the United States, "not an interminable . . . status" that attaches to a noncitizen upon arrival. *Coalition*, 2025 WL 2192986, at *27 (citing approvingly this argument made by plaintiffs based on the text of 8 U.S.C. § 1225(b)(1)(A)(i), (F), (b)(2)(C), (d)(2)). Therefore, an "arriving alien" is one who is in the process of reaching the United States. *See United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) ("If the meaning [of a statute] is plain, the inquiry ends there."); *Torres v. Holder,* 764 F.3d 152, 156 (2d Cir. 2014), *aff'd sub nom. Torres v. Lynch*, 578 U.S. 452 (2016) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").[13]

Applying the plain meaning of the term "arriving" in Section 1225(b)(1)(A)(i), Rodriguez-Acurio can no longer be classified as a noncitizen "who is arriving in the United States" even though she was initially detained as such in Texas in September 2021. When ICE arrested her in Bethpage, New York on October 29, 2025—more than four years after she entered the United States—Rodriguez-Acurio was not then, nor is she now, in the process of

---

[13] Notably, less than a year after IIRAIRA's enactment, the Immigration and Naturalization Service promulgated regulations defining the term "arriving alien" and included people whose parole had expired because Section 1182(d)(5)(A) provided that parole "shall not be regarded as an admission." *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312-01 (Mar. 6, 1997) (interim final rule). However, the promulgation of these regulations coincided with a time period in which "there were many judges who 'abhor[red] . . . 'plain meaning' and preferred instead to elevate 'legislative history'" . . . [and] a law's 'purposes' over enacted statutory text." *Loper Bright*, 603 U.S. at 443 n.6 (Gorsuch, J. concurring). *Loper Bright* reflected a "demand that all return to a more faithful adherence to the written law" consistent with the recognition that "we're all textualists now." *Id.*

"arriving" in the United States. *See Bollat Vasquez v. Wolf*, 460 F. Supp. 3d 99, 111 (D. Mass.

2020) ("Under the statutory language, if applicants are apprehended while crossing the border

(whether or not at a check point), they are 'arriving' applicants under the statute, and if

apprehended at some point thereafter, they are not 'arriving,' but rather "alien[s] present in the

United States who [have] not been admitted." (quoting 8 U.S.C. § 1225(a)(1))).[14] Indeed, it

would be illogical to find that Rodriguez-Acurio is still in the process of "arriving" in the United

States when she has been continuously residing in the United States for more than three years

after the expiration of her humanitarian parole, gave birth to her son in 2022, and was granted

USCIS work authorization for five years starting in June 2025. *See* ECF No. 20-2; Pet. ¶ 16;

*Aviles-Mena*, 2025 WL 2578215, at *4 (concluding that Petitioner "no longer qualifies for

expedited removal because he was 'paroled' into the United States and has been living and

working in the United States for three years").

In fact, even in *Ibragimov*, where the Second Circuit deferred to the agency interpretation

of "arriving alien" in then-in-force 8 C.F.R. § 1.1(q), it nonetheless described humanitarian

parole under Section 1182(d)(5)(A) as "a means by which the government allows aliens who

*have arrived* at a port-of-entry to temporarily remain" in the country even as the parolee has not

been "admitted" to the United States. 476 F.3d at 134 (emphasis added); *see also Coalition*, 2025

WL 2192986, at *28 (construing this language to convey that while a Section 1182(d)(5)(A)

---

[14] Other courts have reached this same conclusion. *See Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1115 (9th Cir. 2025), *cert. granted sub nom. Noem v. Al Otro Lado*, No. 25-5, 2025 WL 3198572 (U.S. Nov. 17, 2025) ("The phrase 'physically present in the United States' encompasses noncitizens within our borders, and the phrase 'arrives in the United States' encompasses those who encounter officials at the border, whichever side of the border they are standing on."); *Martinez*, 2025 WL 3152847, at *8 (holding that because a petitioner was "already present in the United States at the time of his detention [he was] not 'arriving'").

parolee remains "'legally unadmitted,' they 'have arrived'—i.e., their arrival is complete, whereas their admission is not"). This distinction between arrival and admission also explains why much of Respondents' analysis is inapposite to the question of which statute governs Rodriguez-Acurio's detention in 2025.[15]

Accordingly, Rodriguez-Acurio is not an arriving alien and therefore is not subject to mandatory detention under Section 1225(b)(1)(A)(i).

\* \* \*

Because Rodriguez-Acurio cannot be designated for expedited removal and detention under Section 1225(b)(1)(A)(iii)(II), and because she is not an "arriving alien" under Section 1225(b)(1)(A)(i), her detention commencing on October 29, 2025 is not governed by Section 1225(b)(1). This conclusion is compelled by the text of the statute and is consistent with how Respondents have treated her between the expiration of her humanitarian parole in September 2022 and her credible fear interview more than three years later in 2025, at the conclusion of which, she was suddenly arrested and detained. Whereas expedited removal orders are "usually issued within a few days, if not hours," Rodriguez-Acurio's removal proceedings have been pending for more than four years. *Make the Rd.*, 2025 WL 2494908, at \*3. In effect, "when ICE affirmatively chooses to release an individual on parole, it has made the determination that it no longer intends to fast-track their removal and that it will proceed with the standard removal

---

[15] Respondents also make light of the language within Section 1182(d)(5)(A) and decisions in which "[c]ontrolling precedent" holds that "[p]arole does not change parolees' immigration status: they remain 'at the border' for the purposes of immigration law and are treated as applicants for admission into the country." (Resp. at 15 (quoting for example, *Balde*, 943 F.3d at 83).) However, these arguments are unpersuasive for the reasons already addressed with respect to the Designation Provision. *See supra* Discussion § II.A.i.1.

process under 8 U.S.C. § 1229a." *Aviles-Mena*, No. 25-cv-6783, 2025 WL 2578215, at *5 (N.D. Cal. Sept. 5, 2025) (citing 8 U.S.C. § 1225(b)(2)).

Accordingly, the next issue this Court must consider is whether Rodriguez-Acurio is subject to mandatory detention under Section 1225(b)(2) pending removal proceedings under 8 U.S.C. § 1229a.

### ii. *Section 1225(b)(2) Does not Apply to Rodriguez-Acurio*

Respondents invoke Section 1225(b)(2) as a basis for Rodriguez-Acurio's detention only as a "catchall" basis for detention in the event that this Court finds that Section 1225(b)(1) does not apply. (Hr'g Tr. 13:17–14:8, 25:8–25, 31:1–5.) Section 1225(b)(2)(A) provides that "in the case of an alien who is *an applicant for admission*, if the examining immigration officer determines that an alien *seeking admission* is not *clearly and beyond a doubt entitled to be admitted*, the alien shall be detained for a proceeding under section 1229a." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). As other courts have recognized, this language requires that "several conditions must be met" to impose mandatory detention under Section 1225(b)(2). *Lopez Benitez*, 2025 WL 2371588, at *5. The noncitizen must be: "(1) an applicant for admission; (2) seeking admission; and (3) not clearly and beyond a doubt entitled to be admitted." *Id.*; *Martinez v. Hyde*, 792 F. Supp. 3d 211, 214 (D. Mass., 2025). No one disputes that Rodriguez is "an applicant for admission" or that she is "not clearly and beyond a doubt entitled to be admitted." Instead, the question here is whether Rodriguez-Acurio is "seeking admission" such that she is subject to mandatory detention under Section 1225(b)(2)(A).

Like the phrase "arriving alien," the term "'seeking admission' is undefined in the statute," *Martinez*, 792 F. Supp. 3d at 218, but courts have repeatedly held that the term requires "some active desire of process toward admission," *Huamani*, 2025 WL 3079014, at *3; *see*

*Martinez*, 792 F. Supp. 3d at 218 (holding that the term "seeking admission" "necessarily implies some sort of present-tense action"). As already explained, "admission" refers to "the lawful entry of the alien into the United States after inspection and authorization by the immigration officer." 8 U.S.C. § 1101(a)(13)(A). Under a straightforward reading of the statute, "seeking admission is meant to refer to those who are presenting themselves at the border, or who were recently apprehended just after entering." *Hyppolite*, 2025 WL 2829511, at *9.

Although Rodriguez-Acurio is an applicant for admission, she clearly is not presenting herself at the border and was not recently apprehended just after entering, and thereby is not "seeking admission" under Section 1225(b)(2). Moreover, while Rodriguez-Acurio's participation in the credible fear process may indicate that "[s]he continues to 'seek' something, what [s]he seeks is not 'admission' or 'lawful entry' to the United States, but to obtain a lawful means to *remain* here" where she has been continuously residing for more than four years. *Lopez Benitez*, 2025 WL 2371588, at *6 n.7.

In response, Respondents offer the "novel and illogical interpretation of the INA" that Section 1225(b)(2) applies to *all* applicants for admission who are not subject to Section 1225(b)(1). *Hyppolite*, 2025 WL 2829511, at *12; Resp. at 13. Once again, exercising independent assessment based on the statutory text, this Court concludes that Respondents' position has numerous flaws and is contrary to the text of Section 1225(b)(2). Respondents' position has been routinely rejected by other district courts, although such decisions are not binding here. *See, e.g.*, *Hyppolite*, 2025 WL 2829511 at *12 (collecting cases); Reply at 7–8. Indeed, another district court conducted a comprehensive survey of district court decisions and found the following:

> [T]he administration's new position that *all* noncitizens who came into the United States illegally, but since have been living in the United States, *must be detained* until their

removal proceedings are completed – has been challenged in at least 362 cases in federal district courts. The challengers have prevailed, either on a preliminary or final basis, in 350 of those cases decided by over 160 different judges sitting in about fifty different courts spread across the United States.

*Barco Mercado v. Francis*, No. 25-cv-6582, at 9–10 (S.D.N.Y. Nov. 26, 2025) (citing appendices containing references to the 362 cases). The "overwhelming, lopsided majority" reflected in this survey demonstrates "that the law still means what it always has meant." *Id.* at 10. The flaws with Respondents' position are as follows.

First, Respondents' position violates the canon of statutory interpretation that "every clause and word of a statute should have meaning" because if Section 1225(b)(2) applied to all "applicants for admission" there would be no need for Congress to have separately referenced a sub-category of persons "seeking admission" in the specific section. *United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 432 (2023). In other words, Respondents' reading of Section 1225(b)(2)(A) would render the phrase "seeking admission" in the statute superfluous. *See Huamani*, 2025 WL 3079014, at *4; *Hyppolite*, 2025 WL 2829511, at *9; *Lopez-Benitez*, 2025 WL 2371588, at *6.

Second, Respondents' interpretation would be "entirely inconsistent with the Laken Riley Act," which "makes noncitizens subject to mandatory detention if (1) they are inadmissible under certain provisions of 8 U.S.C. § 1182 and (2) are charged with, arrested for, convicted of, or admit to having committed certain crimes." *Huamani*, 2025 WL 3079014, at *4; *see also Lopez Benitez*, 2025 WL 2371588, at *7 (reasoning that the same interpretation of Section 1225(b)(2) offered by Respondents here would "nullify" the Laken Riley Act). As several courts have recently explained:

> If Section 1225(b)(2) applied to noncitizens who are arrested on a warrant while residing in the United States, it would render Section 1226(c)(1)(E)'s criminal conduct criterion superfluous whenever the noncitizen is inadmissible under Sections 1182(a)(6)(A) or

49

> (a)(7). Such an interpretation, which would largely nullify a statute Congress enacted this very year, must be rejected. *See Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

*Huamani*, 2025 WL 3079014, at *4 (citing *Gomes v. Hyde*, No. 25-cv-11571, 2025 WL 1869299, at *7 (D. Mass. July 7, 2025)).

Third, Respondents' reading of Section 1225 would "all but read Section 1226 off the books," because if any person who has entered the country unlawfully is subject to mandatory detention under Section 1225(b)(2)(A), then "it is not clear under what circumstances § 1226(a)'s authorization of detention on a discretionary basis would ever apply." *Huamani*, 2025 WL 3079014, at *4; *Lopez-Benitez*, 2025 WL 2371588, at *8; *see also id.* (reasoning that "there is no indication that Congress intended § 1226 to be limited only to visa overstays").

Fourth, "DHS's own regulations understand an 'applicant seeking admission' to be synonymous with an 'arriving alien.'" *Huamani*, 2025 WL 3079014, at *4. And, as I have already explained, the regulations refer to an arriving alien as an "applicant for admission *coming or attempting to come into* the United States." *Lopez Benitez*, 2025 WL 2371588, at *7 (quoting 8 C.F.R. § 1.2) (emphasis in original); *see also Huamani*, 2025 WL 3079014, at *7 (same).

Respondents' attempts to defend their interpretation of Section 1225(b)(2) and its application to Rodriguez-Acurio in this action are similarly unpersuasive. For example, in support of their claim that Section 1225(b)(2) is a "catchall" basis for detention authority should their Section 1225(b)(1) arguments fail, Respondents quote language from the Supreme Court's decision in *Jennings v. Rodriguez*, 583 U.S. 281 (2018) that "applicants for admission fall into one of two categories, those covered by § 1225(b)(1) and those covered by § 1225(b)(2)." 583 U.S. at 287 (concluding that Section 1225(b)(2) is "broader" than Section 1225(b)(1) and "serves

50

as a catchall provision that applies to all applicants for admission not covered by Section 1225(b)(1)"); *see also* Resp. at 13–14. However, as other judges of this District have held, this language in *Jennings* is "taken out of context" and "arguably *dicta*," since *Jennings* "neither considered nor decided the scope of [the] INA subsections in the context arising here." *Hyppolite*, 2025 WL 2829511, at *10 n.9. Indeed, in *Jennings*, the Supreme Court considered the entirely different question of whether noncitizens who were indisputably subject to the mandatory detention provisions of 8 U.S.C. §§ 1225(b)(1), 1225(b)(2), or 1226(c), were entitled to "periodic bond hearings," and whether the detention of noncitizens under Sections 1225(b)(1) and (b)(2) is limited to a six-month period. *Jennings*, 583 U.S. at 286, 297. In holding that the mandatory-detention provisions of the INA contained no such time limitations, the Supreme Court in *Jennings* "said nothing about whether persons like [Rodriguez-Acurio] were subject to those [mandatory detention] provisions in the first place." *Hyppolite*, 2025 WL 2829511, at *10.[16]

Respondents also rely upon the BIA's recent decision in *Matter of Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025), where the BIA held that the INA requires that all applicants for admission—including those who have been residing in the United States for years—are subject to mandatory detention under Section 1225(b)(2). (Resp. at 16.) However, other courts in the Second Circuit have rejected that holding, and it is not persuasive for all the reasons discussed

---

[16] In support of their interpretation of Section 1225(b)(2), Respondents also cite the Supreme Court's decision in *Thuraissigiam* as well as many of the same statutes and regulations upon which they rely in support of their interpretation of Section 1225(b)(1), which are addressed in the proceeding and subsequent sections, including Sections II.A.i.1 and 2 and II.B.i. (*See* Resp. at 13–15.) However, *Thuraissigiam* is distinguishable for the reasons discussed below. (*See infra* Discussion § II.B.i.) Moreover, Respondents' arguments concerning Section 1182(d)(5)(A) and 8 C.F.R. §§ 1.2, 212.5(e)(2)(i) are addressed and rejected above. *See supra* Discussion § II.A.i.1–2.

already. *See Perez v. Francis*, No. 25-cv-8112, 2025 WL 3110459, at *3 (S.D.N.Y. Nov. 6, 2025) (concluding that the BIA's decision in "*Yajure Hurtado* rested on the premise that detention of noncitizens arrested while residing in the United States is governed by 8 U.S.C. § 1225(b)(2)(A), rather than § 1226(a)," which is "incorrect; detention in these circumstances is governed by § 1226(a)."); *Hyppolite*, 2025 WL 2829511, at *11; *J.U. v. Maldonado*, No. 25-cv-4836, 2025 WL 2772765, at *7 (E.D.N.Y. Sept. 29, 2025). Moreover, after *Loper Bright*, it is the province of the courts—not the BIA—to "authoritatively interpret" the INA. *Loper Bright*, 603 U.S. at 402. Accordingly, Rodriguez-Acurio is not detained under Section 1225(b)(2)(A).

### *iii.  Section 1226(a)*

Sections 1225 and 1226 are "mutually exclusive—a noncitizen cannot be subject to both mandatory detention under § 1225 and discretionary detention under § 1226." *Lopez Benitez*, 2025 WL 2371588, at *4. Because neither Section 1225(b)(1) or (b)(2) govern Rodriguez-Acurio's detention, for all of the reasons explained above, her detention is instead governed by Section 1226(a).

Section 1226(a) "authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings," *Jennings*, 583 U.S. at 289, and it applies when a noncitizen is "arrested and detained" "[o]n a warrant issued by the Attorney General," 8 U.S.C. § 1226(a). That is precisely what occurred here. Rodriguez-Acurio was arrested on a Form I-200 U.S. Department of Homeland Security Warrant for Arrest of Alien issued pursuant to Section 1226(a). The face of the warrant states that an immigration officer issued the warrant "pursuant to sections 236 and 287 of the Immigration and National Act" and part 287 of title 8 of the Code of Federal Regulations. (Form I-200 Warrant.) Those sections correspond to 8 U.S.C. §§ 1226, 1357 and 8 C.F.R. 287.1–287.12. Although not dispositive standing alone, Rodriguez-

Acurio's arrest on a warrant under Section 1226 supports the conclusion that her detention is governed by Section 1226(a)'s discretionary framework. *See Sampiao v. Hyde*, No. 25-cv-11981, 2025 WL 2607924, at *1 (D. Mass. Sept. 9, 2025) (holding that to mandate the petitioner's detention "in these circumstances would contravene Congress's intent that Section 1226(a)'s discretionary detention framework apply to all noncitizens arrested on a warrant except those subject to Section 1226(c)'s carve out"); *dos Santos v. Noem*, No. 25-cv-12052, 2025 WL 2370988, at *7 (D. Mass. Aug. 14, 2025) ("Section 1225(b)(2) does not apply to noncitizens who are arrested on a warrant issued by the Attorney General while residing in the United States.").

At the Show Cause Hearing, Respondents objected to the characterization of the warrant as being issued pursuant to Section 1226(a) and not Section 1225. (Hr'g Tr. 27:18–30:19.) They argue that the warrant also cites 8 C.F.R. 287.3, which governs the "[d]isposition of cases of aliens arrested without warrant" and is associated with Section 1225(b). *See* 8 C.F.R. 287.3; Hr'g Tr. 27:18–30:19. However, the fact that a broader citation on the face of the warrant includes a regulation that deals with warrantless arrests, which then in turn cites Section 1225, does not establish that the warrant was issued to effect a mandatory detention under Section 1225(b). To the contrary, Section 1225(b) "contains no warrant requirement," *Maldonado*, 2025 WL 2772765, at *6, and one possible indication that a person is detained pursuant to Section 1225(b) is that the person was arrested or detained *without a warrant*. *See Matter of Li*, 29 I. & N. Dec. 66, 66 (BIA 2025) ("Once an alien is detained under section 235(b), DHS cannot convert the statutory authority governing her detention from section 235(b) to section 236(a) through the post-hoc issuance of a warrant."). The fact that ICE secured a warrant to detain Rodriguez-Acurio therefore suggests that they understood her to be subject to discretionary rather than

mandatory detention, since securing such a warrant was unnecessary if Respondents were actually detaining her under Section 1225(b).

Thus Rodriguez-Acurio's detention following the credible fear interview is governed by Section 1226(a). Having resolved these threshold questions regarding which statute governs Rodriguez-Acurio's detention, the next issue concerns whether Rodriguez-Acurio has a right to procedural due process and whether Respondents violated that right.

## B. Procedural Due Process

The Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Rodriguez-Acurio argues that her detention violates her Fifth Amendment rights to procedural due process. (Pet. ¶¶ 26–31.) When evaluating a procedural due process claim, there are "two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Radwan v. Manuel*, 55 F.4th 101, 123 (2d Cir. 2022); *see also Nnebe v. Daus*, 931 F.3d 66, 80 (2d Cir. 2019).

### i. *Rodriguez-Acurio's Detention Infringes on her Protected Liberty Interest*

Rodriguez-Acurio argues that her detention by ICE triggers her right to procedural due process because any decision to detain her is subject to Section 1226(a) and there is no dispute that she was given no notice or opportunity to be heard prior to her sudden arrest and detention at the conclusion of her credible fear interview, much less an individualized determination by a DHS officer on whether she poses a public safety or flight risk or the opportunity to appeal such a determination to an immigration judge. (*See* Reply at 5.)

Respondents' brief in response to the Order to Show Cause focuses primarily on whether Rodriguez-Acurio's detention infringes on a protected liberty interest. They argue that because

Rodriguez-Acurio is an applicant for admission, "'the Due process Clause provides nothing more' than the procedural protections set forth in 8 U.S.C. § 1225." (Resp. at 11 (quoting *Thuraissigiam*, 591 U.S. at 139–40).) To support this claim, Respondents rely principally on the Supreme Court's decisions in *Thuraissigiam* and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953), as well as a handful of decisions citing those cases. (Resp. at 10–12.) Respondents place particular emphasis on language in *Thuraissigiam* that noncitizens "who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are 'treated' for due process purposes 'as if stopped at the border.'" 591 U.S. at 139; *see also id.* at 140 (holding "[f]or [this] reason[], an alien *in respondent's position* has only those rights regarding *admission* that Congress has provided by statute" (emphasis added)); Resp. at 11. Because Rodriguez-Acurio was paroled into the country, they argue, she is "stopped at the border" and is not entitled to any further procedural due process than that afforded under Section 1225(b)(1), even in the context of detention. (Resp. at 11.)

As an initial matter, and for the reasons addressed at length, Rodriguez-Acurio's detention is not pursuant to Section 1225(b)(1) or Section 1225(b)(2) under the text of these statutory provisions. She is therefore entitled to the protections afforded by Section 1226(a). *See supra* Discussion § II.A.iii.

More importantly, however, Respondents misstate the law. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Due Process Clause "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020); *see also Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903) (noncitizen who entered the country in

55

violation of the law cannot be "deprived of [her] liberty" without receiving "due process of law")). In habeas proceedings concerning executive detention, courts must conduct "the most searching review" to ensure the legality of detention that "occur[s] without the procedural protections required in courts of law." *Velasco Lopez*, 978 F.3d at 850–51.

Contrary to Respondents' contentions, *Thuraissigiam* stands for the limited principle that those "at the threshold of initial entry" stand on a different footing for due process purposes than noncitizens "who have established connections in this country." 591 U.S. at 107. Whereas Rodriguez-Acurio was paroled into the interior of the United States, has been living and working in the United States for more than four years, and has a three-year-old U.S. citizen child (Pet. ¶¶ 2, 16; Lipsitz Aff. ¶ 6), *Thuraissigiam* was "brought by an individual who was apprehended *25 yards* from the border and then was subject to continuous detention," *Aviles-Mena*, 2025 WL 2578215, at *4 (citing *Thuraissigiam*, 591 U.S. at 119) (emphasis added). Therefore, *Thuraissigiam* "merely held that noncitizens '*in [the] respondent's position*'—those detained close to the border 'shortly after unlawful entry'—have not yet "effected an entry." *Make the Rd.*, 2025 WL 2494908, at *11 (quoting *Thuraissigiam*, 591 U.S. at 140) (emphasis in original).

Moreover, the passing reference in *Thuraissigiam* to "those paroled elsewhere in the country" is dicta and does not alter this conclusion here. *See* 591 U.S. at 140 (citing *Mezei*, 345 U.S. at 215). As the district court explained in *Make the Road*, this one reference in *Thuraissigiam* to people on parole reflects a rule originating in the "historical practice of allowing ships containing noncitizens to land in American harbors rather than staying at sea . . . while immigration authorities determined the admissibility of the noncitizens." *Make the Rd.*,

2025 WL 2494908, at *12 n.15.[17] Treating parole as akin to being stopped at the border in that situation is consistent with the underlying rationale in *Thuraissigiam* that the power to exclude "foreigners who have *never . . . acquired any domicil or residence* within the United States" is a "sovereign prerogative." 591 U.S. at 138–39 (emphasis added). However, unlike Thuraissigiam, Rodriguez-Acurio was paroled into the interior of the United States, has continuously resided in New York for more than four years, has developed deep community ties, was granted five years of work authorization from 2025 to 2030, and therefore cannot be analogized to a person stopped within 25 yards of the border. *See Make the Rd.*, 2025 WL 2494908, at *12 (reasoning that while the "government's power 'is at its zenith at the international border,'" the Constitution requires the government to "turn square corners" in the country's interior, which "means affording due process"). Therefore, "[j]ust as *Thuraissigiam* cannot swallow the general rule that those who have effected entry are entitled to due process, neither can the legal fiction that the Court crafted for parolees." *Id.* at *12 n.15.

Furthermore, it is also notable that *Thuraissigiam*'s holding concerns only "the right to additional due process sought over admission determinations" and does not "address the due

---

[17] For the same reason, the cases cited in *Thuraissigiam* for this proposition are similarly inapposite. For example, *Mezei* concerned a noncitizen who had been "permanently excluded from the United States on security grounds but stranded in his temporary haven on Ellis Island because other countries [would] not take him back." 345 U.S. at 207. The Supreme Court expressly recognized that Mezei's exclusion for security reasons was also distinguishable from those cases, like the one here, where such justifications do not exist. *Id.* at 216 ("An exclusion proceeding grounded on danger to the national security, however, presents different considerations; neither the rationale nor the statutory authority for such release exists."). Likewise, in *Kaplan v. Tod*, 267 U.S. 228, 229 (1925), "[t]he appellant was born in Russia," was brought to the U.S., "was ordered to be excluded" and then, because of World War I, was kept first at Ellis Island and then at the Hebrew Sheltering and Immigrant Aid Society "until she could be deported safely." *Id.* Finally, *Leng May Ma* concerned the legal status of temporarily paroled persons under a since-replaced provision of the INA and did not interpret the procedural due process rights of someone in Rodriguez-Acurio's position. 357 U.S. at 186–188.

process rights of a noncitizen to remain free once released." *Hyppolite*, 2025 WL 2829511, at

*10 (quoting *Salcedo Aceros v. Kaiser*, No. 25-cv-6924, 2025 WL 2637503, at *6 (N.D. Cal.

Sep. 12, 2025)). Indeed, the Supreme Court made clear that Thuraissigiam sought "a new

opportunity to apply for asylum and other applicable forms of relief" and that "[h]is petition

made *no mention of release from custody*." 591 U.S. at 115 (emphasis added). By contrast

Rodriguez-Acurio invokes "the most significant liberty interest there is—the interest in being

free from imprisonment." *Velasco Lopez*, 978 F.3d at 851; *see also Aviles-Mena*, 2025 WL

2578215, at *4 (finding *Thuraissigiam* inapplicable because the petitioner's "habeas petition

challenges his detention, not his 'admission'").[18]

Finally, having rejected Respondents' characterization of *Thuraissigiam*, it is worth

putting in perspective the rule they seek. As was the case in *Make the Road*, Respondents'

position here would create a:

> startling rule—that unless and until someone is lawfully admitted, they are entitled to
> zero process beyond whatever courtesy Congress might offer. If that was right, Congress
> could subject noncitizens who had spent decades in the United States to immediate
> removal, without any advance notice or right to a hearing, and the Constitution would
> have nothing to say about it.

2025 WL 2494908, at *11.

For all of these reasons, Rodriguez-Acurio's situation is distinguishable from

*Thuraissigiam*, and she has a liberty interest in being free from detention that is afforded

---

[18] The other cases on which Respondents rely are distinguishable for similar reasons. For
example, *Guerrier v. Garland*, 18 F.4th 304 (9th Cir. 2021), like *Thuraissigiam*, concerned a
noncitizen who was apprehended "shortly" after crossing the border, proceeded thereafter
through expedited removal, and sought to distinguish his case from that of *Thurassigiam* on the
sole ground that "Thuraissigiam filed a habeas petition" whereas Guerrier directly appealed an
expedited removal order to the Ninth Circuit. 18 F.4th at 307 n.1, 313; *see also* Resp. at 12.

procedural due process protection. *Velasco Lopez*, 978 F.3d at 850 (confirming that the Fifth

Amendment "covers noncitizens, whether their presence here is lawful, unlawful, temporary, or

permanent"). Rodriguez-Acurio's liberty interest was necessarily infringed by her detention by

ICE officials on October 29, 2025, immediately following her credible fear interview.

### ii.   *Respondents Did Not Provide Rodriguez-Acurio Adequate Notice and an Opportunity to be Heard.*

Next is whether Respondents violated Rodriguez-Acurio's procedural due process rights

by detaining her without any pre-deprivation notice or opportunity to be heard. To make that

determination, courts balance the factors laid out in *Mathews v. Eldridge*: (1) "the private interest

that will be impacted by the official action"; (2) "the risk of an erroneous deprivation of such

interest through the procedures used, and the probable value, if any, of additional or substitute

procedural safeguards"; and (3) "the [g]overnment's interest, including the . . . fiscal and

administrative burdens that the additional or substitute procedural requirement[s] would entail."

424 U.S. at 335; *see also Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 191 (2d Cir.

2020). Because the *Mathews v. Eldridge* test "entails balancing multiple factors . . . due process is

flexible and calls for such procedural protections as the particular situation demands." *Liberian

Cmty. Ass'n of Conn.*, 970 F.3d at 191 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

However, the "essence of due process" is the requirements of notice and an opportunity to be

heard. *Mathews*, 424 U.S. at 348; *see also Almazon v. Town of Oyster Bay*, No. 24-2789-CV,

2025 WL 1215309, at *3 (2d Cir. Apr. 28, 2025) (summary order).

Rodriguez-Acurio argues that because she was afforded no pre-deprivation notice or

opportunity to be heard, her detention violates her right to procedural due process. Respondents

do not address any of the *Mathews* balancing factors in their briefing. Based on an assessment of

these factors, Respondents' detention of Rodriguez-Acurio violated her procedural due process rights.

### 1. Private Interest

As already established, with regards to the first factor, Rodriguez-Acurio invokes "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851. On October 29, 2025, Rodriguez-Acurio was detained without any notice, explanation, or an opportunity to be heard, first at 26 Federal Plaza in New York and then at an ICE facility in New Jersey. (Joyce Decl. ¶ 7, 9, 10; ECF No. 16.) As a result, she was separated from her family, including her three-year old U.S. citizen child, for whom she is the primary caregiver. Rodriguez-Acurio spent six days detained at "26 Federal Plaza Hold Room facility," which was limited to "fifty square feet per" noncitizen, "exclusive of eight-foot buffer zone[s] around toilets." (Joyce Dec. ¶ 15.a; ECF No. 16.) While detained there, Rodriguez-Acurio was deprived of the ability to shower and slept on a sleeping mat because 26 Federal Plaza does "not have shower facilities or beds." (Resp. at 9 n.3.) During the entirety of her detention, Rodriguez-Acurio experienced additional restraints that she would not experience if at liberty, including restrictions on when and how she could communicate with legal counsel during removal proceedings, which includes the time period during which she was preparing to appear before an immigration judge on appeal from a negative credible fear determination. (*See* Nov. 10, 2025 Tel. Conf. Tr. 16:14–17:1.) Respondents' detention of Rodriguez-Acurio thus implicates her weighty private interest in personal liberty.

Rodriguez-Acurio's interest in being free from detention is significant even in the context of the Section 1226(a) discretionary detention scheme. Section 1226(a) provides that, "pending a decision on whether [an] alien is to be removed from the United States," the Attorney General

"may . . . detain" the noncitizen or "may release" the noncitizen on "bond" or "conditional parole." 8 U.S.C. § 1226(a). Moreover, the regulations implementing Section 1226(a) delegate to DHS officers the authority to grant bond or conditional parole, and pursuant to such authority, a DHS officer must make an individualized determination as to whether detention is appropriate based on two factors—whether the noncitizen is (1) a "danger to property or persons" and (2) is "likely to appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8); *see also Lopez Benitez*, 2025 WL 2371588, at *10. The noncitizen has an "opportunity to appeal a detention decision" by the DHS officer who conducted this individualized assessment "to an immigration judge who then conducts their own assessment of the noncitizens' flight risk and dangerousness, among other factors." *Lopez Benitez*, 2025 WL 2371588, at *10 (citing 8 C.F.R. § 1003.19(d)).

Accordingly, Section 1226(a) and its implementing regulations vest DHS with "broad authority to arrest and detain noncitizens, but due process must account for the wide discretion that Section 1226(a) vests in the Government to arrest *any* person in the United States suspected of being removable" especially in light of the individualized custody determination that Section 1226(a) and its implementing regulations require. *Lopez Benitez*, 2025 WL 2371588, at *10 (emphasis in original). Rodriguez-Acurio therefore has a weighty private interest in being granted parole or bond under Section 1226(a) pending removal proceedings.

### 2. *Risk of Erroneous Deprivation*

Here, the complete lack of any pre- or post-deprivation notice and opportunity for Rodriguez-Acurio to be heard before a DHS officer or immigration judge gives rise to an extraordinarily high risk of erroneous deprivation, and the additional procedural safeguard of requiring any detention to be preceded by a bond hearing before an immigration judge would squarely address that risk.

Civil immigration detention must be "nonpunitive in purpose" and bear a "reasonable relation" to the authorized statutory purposes of preventing flight and danger to the community. *Zadvydas*, 533 U.S. at 690; *see also Aviles-Mena*, 2025 WL 2578215, at *5. Additionally, "[t]he purpose of requiring an exercise of discretion [under Section 1226(a)] prior to the decision to detain a noncitizen who is not subject to mandatory detention is to prevent an erroneous deprivation of liberty." *Lopez Benitez*, 2025 WL 2371588, at *12.

The evidence in the record unequivocally establishes that Rodriguez-Acurio is neither a flight risk nor a danger to the community and should be discretionarily released under Section 1226(a). Pursuant to Respondents' own regulations, ICE's original decision to parole Rodriguez-Acurio into the United States on September 14, 2021 was required by regulation to be premised on the determination that Rodriguez-Acurio was "neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b) (humanitarian or public interest parole may not be granted if non-citizen presents a security risk or a risk of absconding). Respondents have not submitted any evidence of changed circumstances. To the contrary, Rodriguez-Acurio "reported . . . for every appointment directed" (Pet. ¶ 18), including an October 21, 2021 ICE check in, an October 30, 2024 USCIS fingerprinting appointment, and her October 29, 2025 credible fear interview (Fourth Langlois Decl. ¶¶ 11, 13; ECF No. 20-1; Nov. 10, 2025 Tel. Conf. Tr. 12:11–15:9 (reflecting that Respondents did not contest that Rodriguez-Acurio attended all appointments as directed)). Moreover, USCIS granted Rodriguez-Acurio five years of work authorization on June 6, 2025, which entirely undermines any assertion that she presents a public safety risk. (Nov. 10, 2025 Tel. Conf. Tr. 13:6–10; ECF No. 20-2.) Respondents fail to point to anything in the record showing that Rodriguez was a flight or public safety risk and have admitted that they chose not

to schedule any additional ICE check-ins for Rodriguez-Acurio following the October 21, 2021 check-in. (Fourth Langlois Decl. ¶¶ 11–13.)

Respondents did not conduct any individualized determination showing a consideration of these facts when abruptly detaining Rodriguez-Acurio on October 29, 2025, immediately after her credible fear interview. Nor did they consider the value of any additional procedural safeguards that could have protected against the risk of erroneous deprivation of liberty, such as having a DHS officer conduct an individualized determination or bringing Rodriguez-Acurio before an immigration judge. Instead, when one of Rodriguez-Acurio's attorneys, Lipsitz, "inquired about the reason for [Rodriguez-Acurio's] detention, one of the [ICE] officers acknowledged that it was unusual given her clean record and commented, 'This is just a sign of the times.'" (Lipsitz Aff. ¶ 5.) Lipsitz "pleaded for an alternative to detention, such as an ankle monitor," and one of the ICE officers attempted to contact a supervisor to request release with a GPS monitor, but the request was denied. (*Id.* ¶ 7.)

Therefore, Rodriguez-Acurio's detention without any notice or opportunity to be heard, including an individualized assessment into whether she poses a flight or public safety risk, such as "any change in circumstances" since her release on temporary parole in September 2021 establishes a high risk of erroneous deprivation of her protected liberty interest. *See Lopez Benitez*, 2025 WL 2371588, at *12; *Hyppolite*, 2025 WL 2829511, at *13–14 (finding an "extremely high" risk of erroneous deprivation where a person is detained under Section 1226(a) without any pre-deprivation notice or an opportunity to be heard); *cf. Black v. Decker*, 103 F.4th 133, 152 (2d Cir. 2024) (holding that the "almost nonexistent procedural protections in place for section 1226(c) detainees markedly increase[] the risk of  an erroneous deprivation").

### 3. The Government's Interest in Detaining Rodriguez-Acurio Without a Hearing

Here, Respondents have not addressed any of the *Matthews v. Eldridge* factors, much less any government interests advanced by the detention of Rodriguez-Acurio. The Second Circuit has recognized that "the Attorney General's discretion to detain individuals under [Section 1226(a)] is valid where it advances a legitimate governmental purpose," such as "ensuring that noncitizen[s] do not abscond and . . . ensuring they do not commit crimes." *Velasco Lopez*, 978 F.3d at 854. However, Respondents have also pointed to no evidence in the record showing that Rodriguez-Acurio is a flight risk or a danger to the community or that anything has changed since she was released on humanitarian parole, which necessarily involved the determination that she posed no flight or public safety risk. *See* 8 C.F.R. § 212.5(b). Respondents therefore fail to demonstrate that Rodriguez-Acurio's detention advances any legitimate government interests.

Moreover, contrary to Respondents' contentions, Rodriguez-Acurio does not argue that "judicial-type procedures must be imposed upon [the] administrative action[s]" of ICE greater than those already required by law. *Velasco Lopez*, 978 F.3d at 851; *see also Chipantiza-Sisalema v. Francis*, No. 25-cv-5528, 2025 WL 1927931, at *3 (S.D.N.Y. July 13, 2025). Rather, all she argues is that the "agency must comply with the procedures already in place, and its failure to do so amounts to a complete and arbitrary denial of due process." *Id.* (citing *Velasco Lopez*, 978 F.3d at 851). Here, there is no evidence that Rodriguez-Acurio poses a public safety or flight risk. Respondents' decision to detain her immediately following her credible fear interview, without any individualized determination by a DHS officer that she poses a public safety or flight risk, subject to review by an immigration judge, does not advance any legitimate government purpose.

* * *

64

Weighing all of the *Matthews* factors—the significant liberty interest at stake, the high risk of erroneous deprivation through lack of notice and an opportunity for Rodriguez-Acurio to be heard, and Respondents' failure to demonstrate that detention is required to advance any legitimate government interest in ensuring Rodriguez-Acurio's appearance at removal proceedings or preventing danger to the community, Respondents' detention of Rodriguez-Acurio with no notice or opportunity to be heard and no showing of changed circumstances violates her due process rights. *See, e.g.*, *Lopez Benitez*, 2025 WL 2371588, at *13; *Huamani*, 2025 WL 3079014, at *9.

Respondents argue, without citing authority, that the "majority, if not all of the cases cited by [Rodriguez-Acurio]" involved situations in which the petitioners had been detained for "periods of months" and there is a "six month presumpti[on] that detention is valid." (*Id.* 22:22–23:11.) Respondents appear to refer to *Black v. Decker*, in which the Second Circuit held that prolonged detention under Section 1226(c) without a bond hearing violates due process and that, although there is no bright-line rule, the Supreme Court has "recognized a 'presumptively reasonable period of detention' of 'six months.'" 103 F.4th at 150 (citing *Zadvydas*, 533 U.S. at 701).

*Black* is inapposite. As other courts have recognized, in that case, the petitioners "agreed that the government could detain them without an initial bond determination." *Huamani*, 2025 WL 3079014, at *8 (discussing *Black*, 103 F.4th at 142). Here, by contrast, Rodriguez-Acurio's detention was unlawful from its inception because ICE detained her under the wrong statute and without affording her any notice or process whatsoever, much less the procedures due under Section 1226(a). Accordingly, Respondents' detention of Rodriguez-Acurio violated her Fifth Amendment rights.

### III.    Remedy

Upon finding a constitutional violation, a district court "may" grant a writ of habeas corpus and "dispose of the matter as law and justice so require." 28 U.S.C §2241(a), 2243. Release from detention is the "typical remedy" for "unlawful executive detention." *Munaf v. Green*, 553 U.S. 674, 693 (2008).

Here, Rodriguez-Acurio seeks a preliminary injunction or writ of habeas corpus directing Respondents to immediately release her or provide a bond hearing. (Pet. at 12.) She also seeks any "such other relief as the Court deems just and proper." (*Id.*)

Respondents argue that even if Rodriguez-Acurio's detention is governed by Section 1226(a) she is not entitled to immediate release because the statute "contemplates that the bond hearing and/or the conditional parole hearing that are discretionary under the statute would come *after* detention has actually occurred." (Hr'g Tr. 22:14–18 (emphasis added).) They further argue that "the only remedy is to order an immigration judge bond hearing." (*Id.* 37:11–13, 38:6–12.)

Here, a bond determination by a DHS officer or an immigration judge would not remedy the core constitutional violation at issue here. Rodriguez-Acurio's detention was unlawful from its inception because ICE detained her under the wrong statute and without any notice or opportunity to be heard, much less the procedures required under Section 1226(a). In this situation a post-deprivation bond hearing before a DHS officer or even an immigration judge would provide no genuine opportunity to relief because the detention without adequate pre-deprivation procedures has already been carried out. *See, e.g.*, *Barco Mercado*, No. 25-cv-6582, at 31 (holding that a post-deprivation "bond hearing would not provide a genuine opportunity for adequate relief" because the petitioner had been "redetained . . . pursuant to the wrong statute and accordingly afforded [] no process whatsoever"); *Lopez Benitez*, 2025 WL 2371588, at *13

66

(holding that a post-deprivation bond hearing was "not a substitute for the requirement that ICE engage in a deliberative process prior to, or contemporaneous with, the initial decision to strip a person of the freedom that lies at the heart of the Due Process Clause").

Moreover, were this Court to require a bond hearing before an immigration judge, such relief would also be "futile" because, on September 6, 2025, the BIA held that "[b]ased on the plain language of section 235(b)(2)(A) of the INA, Immigration Judges lack authority to hear bond requests or to grant bond to aliens who are present in the United States without admission." *Barco Mercado*, No. 25-cv-6582, at 31–32 (quoting *Yajure Hurtado*, 29 I & N. Dec. at 216). That decision is binding on all immigration judges and would bar Rodriguez-Acurio from being granted bond as an applicant for admission. *See Barco Mercado*, No. 25-cv-6582, at 31–32. Pursuant to *Yajure Hurtado*, not only are immigration judges not holding bond hearings, but any request for release on bond would be denied, resulting in a situation that "would be 'Kafkaesque.'" *Id.* And even if an immigration judge were to hold a hearing and grant bond, it is a "foregone conclusion under [*Yajure*] *Hurtado*" that ICE would succeed in reversing that decision on appeal. *Carlos v. Noem*, No. 25-cv-1900, 2025 WL 2998184, at *4 (D. Nev. Oct. 24, 2025).

Therefore, "disposing of the matter as law and justice require" necessitates Rodriguez-Acurio's release from detention and relief guarding against her re-detention in violation of this Court's determinations that she is not subject to mandatory detention under Section 1225(b). *See* 28 U.S.C. § 2243. ICE caused Rodriguez-Acurio to be placed in custody in violation of her rights to procedural due process. The proper remedy for that unlawful detention is release. *See Munaf*, 553 U.S. at 693; *see, e.g.*, *Barco Mercado*, No. 25-cv-6582, at 33; *Lopez Benitez*, 2025 WL 2371588, at *13; *Huamani*, 2025 WL 3079014, at *9. Respondents' proposed alternative that

67

this Court require an immigration judge to conduct a bond hearing is futile for the reasons already addressed. *Barco Mercado*, No. 25-cv-6582, at 31–32 (quoting *Yajure Hurtado*, 29 I & N. Dec. at 216); *Carlos*, 2025 WL 2998184, at *4. Moreover, Respondents' contention that Rodriguez-Acurio should be detained for at least six months before any habeas relief entirely misunderstands the nature and purpose of habeas relief. Here, where the Court has already determined that Rodriguez-Acurio's detention was unlawful from its inception due to the failure to provide the required notice and opportunity to be heard, the illegality of Rodriguez-Acurio's detention does not hinge on whether the length of the detention is also unduly prolonged.

Accordingly, on November 10, 2025, the Court issued an oral order requiring Respondents to immediately release Rodriguez-Acurio. The Court's oral order also enjoined Respondents from re-detaining Rodriguez-Acurio without ensuring that she receives a bond hearing before an immigration judge to assess whether she poses a flight risk or safety risk. However, in light of the BIA's decision rendering such bond hearings before an immigration judge futile, the Court's oral ruling is modified as follows: pending the issuance of any final removal order against Rodriguez-Acurio, Respondents are enjoined from denying her bond in any subsequent proceeding on the basis that she must be detained pursuant to Section 1225(b) absent a change in relevant circumstances consistent with this Opinion and Order. *See, e.g.*, *Barco Mercado*, No. 25-cv-6582, at 31–32 (granting similar relief); *Torres v. Francis*, No. 25-cv-8408, 2025 WL 3168759, at *6 (S.D.N.Y. Nov. 13, 2025) (same); *Fangzeng Huang v. Almodovar*, No. 25-cv-9346, 2025 WL 3295912, at *4 (S.D.N.Y. Nov. 26, 2025) (same); *Martinez v. McAleenan*, 385 F. Supp. 3d 349, 373 (S.D.N.Y. 2019) ("As Petitioner's arrest and detention were blatantly unlawful from the start, the only commensurate and appropriate equitable remedy to even partially restore Plaintiff is to immediate release him and enjoin the

68

Government from further similar transgressions.")[19] This additional relief is necessary in order to ensure that the release of Rodriguez-Acurio pursuant to this Opinion and Order is not rendered meaningless.[20] As a result, the relief ordered here falls within the "core of habeas." *Thuraissigiam*, 591 U.S. at 119.

## CONCLUSION

For the reasons set forth above, Rodriguez-Acurio's Petition (ECF No. 1) was granted on November 10, 2025. On November 11, 2025, Respondents confirmed that Rodriguez-Acurio was released from custody on November 10, 2025, in accordance with the Court's amended oral order granting the Petition and ordering her release from the Elizabeth Contract Detention Facility in New Jersey. (ECF No. 23.) Additionally, pending the issuance of any final removal order against Rodriguez-Acurio, Respondents are also enjoined from denying her bond in any

---

[19] Numerous courts outside the Second Circuit have also ordered similar relief in granting a writ of habeas corpus against unlawful detention by ICE. *See, e.g.*, *Kashranov v. Jamison*, No. 25-cv-5555, 2025 WL 3188399, at *8 (E.D. Pa. Nov. 14, 2025); *Chogllo Chafla v. Scott*, No. 25-cv-437-SDN, 2025 WL 2688541, at *12 (D. Me. Sept. 21, 2025); *Aguilar Guerra v. Joyce*, No. 25-cv-534, 2025 WL 2999042, at *3 (D. Me. Oct. 24, 2025).

[20] This Court is mindful that the traditional remedy in habeas is release from illegal custody. *Thuraissigiam*, 591 U.S. at 107 (2020) ("Habeas has traditionally been a means to secure *release* from unlawful detention." (emphasis in original)) Certain relief requested may be "far outside the 'core' of habeas" such that it "may not be pursued through habeas." *Id.* at 119. Thus, in *Thuraissigiam*, the Supreme Court rejected as an improper habeas remedy, the request to vacate a removal order and grant a new opportunity to seek asylum. *Id.* at 119–20. Here, the Court's order enjoining Respondents, pending any final order of removal against Rodriguez-Acurio, from denying her bond on the basis that she must be detained pursuant to 8 U.S.C. § 1225(b) absent a change in relevant circumstances lies within the core of habeas relief because it seeks to ensure compliance with this Court's order granting release. *See, e.g.*, *Martinez*, 385 F. Supp. 3d at 373.

subsequent proceeding on the basis that she must be detained pursuant to 8 U.S.C. § 1225(b),

absent a change in relevant circumstances consistent with this Opinion and Order.


Dated:  Central Islip, New York
        November 28, 2025


                              _/s/ Nusrat J. Choudhury____
                              NUSRAT J. CHOUDHURY
                              United States District Judge